462 P.2d 775

**SWIFT & COMPANY, a corporation,
Appellant**

v.

**STATE TAX COMMISSION of Arizona
et al., Appellees.**

**No. 9749–PR.**

Supreme Court of Arizona.

In Banc.

Dec. 15, 1969.

Gust, Rosenfeld & Divelbess, by John C. Wesley, Phoenix, for appellant.

Gary K. Nelson, Atty. Gen., Darrell F. Smith, Former Atty. Gen., James D. Winter, Asst. Atty. Gen., for appellees.

McFARLAND, Justice:

These are Cross-Petitions for Review from a decision of the Court of Appeals, Division One, Swift & Co. v. State Tax Commission, 10 Ariz.App. 10, 455 P.2d 459. The petitioner-plaintiff, Swift & Company (Swift) brought suit in the Superior Court of Maricopa County to recover Transaction Privilege Taxes[1] and Education Excise Taxes[2] imposed by the petitioner-defendant, State Tax Commission (Commission). The taxes were levied on meat and dairy products sold to base exchanges, commissaries and commissioned officers' clubs located on several military bases throughout the State during the period from March 1, 1961, to December 31, 1964. Swift originally paid the sum of $16,524.43 without protest. However, as a result of an audit the Commission made an additional assessment of $19,191.36. Swift paid the latter sum under protest, and followed the procedures set forth in § 42–1339, A.R.S.

The facts not being disputed both plaintiff and defendant made cross-motions for summary judgment, and the Superior Court denied Swift's motion, granted that of the Commission, and entered judgment thereon. Swift appealed from the entire judgment, which by implication included its contention as to non-protested tax payments, although the Superior Court did not explicitly rule on that point because of its disposition of the basic question.

The Court of Appeals reversed the order and judgment of the trial court as to the claim for refund of the protested $19,191.36 payment, and then affirmed the lower court as to the disposition of the original, non-protested payment of $16,524.43, which actually was never determined by that court. Technically, this was error in that the Court of Appeals attempted to affirm a non-existent judgment. In view of this, and our subsequent opinion, the decision of the Court of Appeals will be vacated.

According to the uncontroverted facts and the underlying statutory law it is quite simple—Swift wholesales its products to the various military establishments (not for general troop requirements such as mess halls where, in such case, Swift would undeniably be a retailer) which establishments prepare and resell the food for consumption to qualified base personnel, their families and guests. That the sales involved here are not for direct troop consumption is apparent from the following portion of an uncontroverted affidavit:

"P. L. SAUNDERS, being first duly sworn, upon oath deposes and says:

"I am a Captain in the United States Air Force and am the Commissary Officer at Luke Air Force Base, Arizona. As Commissary Officer, I am in charge of all acquisitions and dispositions of foods and food stuffs handled by the Commissary.

\*     \*     \*     \*     \*     \*

"The Retail Store carries food and hard and soft goods for sale to active and retired military personnel and their fam-

1. § 42–1301 et seq., A.R.S.

2. § 42–1361 et seq., A.R.S.

ilies. *The Commissary at Luke Air Force Base contracts* directly for most of the items carried in the Retail Store. Swift & Company is one of the suppliers to the Retail Store with which the Commissary makes direct contracts. * * * all foods purchased by the Commissary from the local offices of Swift & Company are purchased for the purpose of reselling the same to the Commissary patrons in the Retail Store. None of the food purchased from Swift & Company locally is used for troop feeding requirements."

That this same resale procedure obtains at the other facilities here involved is pointed out in the following excerpts from other uncontroverted affidavits:

"L. A. CLAUSEN, being first duly sworn, upon oath deposes and says:

"I am employed as Club Manager of the Luke Air Force Base commissioned officers' open mess (Officers' Club). As Club Manager, I am in direct supervision of all Club activities, including those pertaining to the purchase, preparation and sale of all food stuffs.

"The Officers' Club makes periodic purchases of meats, meat products and dairy products from Swift & Company. These items are prepared in our kitchen for sale to and consumption on the premises by the individual members of the Club and their guests in the dining room and snack bar.

"All foods purchased by the Officers' Club from Swift & Company are purchased for the purpose of reselling the same, after any necessary preparation, to Club patrons. * * *"

The Base Exchange Supervisor, J. R. Trammell, averred:

"I am a retired member of the military service and am employed by the Base Exchange at Luke Air Force Base, Arizona. I am presently and for about five and one-half (5½) years have been, the Food Supervisor for the Base Exchange.

\* \* \* \* \* \*

"Within my personal knowledge, all such purchases by the Luke Air Force Base Exchange from Swift & Company are made for the purpose of reselling these products as described in the preceding paragraph. * * *"

Clearly then, under the Transaction Privilege Tax statutes, Swift is a wholesaler and thereby is within the tax exemption. Section 42-1301, A.R.S., defines the terms as follows:

"11. 'Retailer' includes every person engaged in the business of making sales at retail, and when in the opinion of the commission it is necessary for the efficient administration of this article, includes dealers, distributors, supervisors, employers and salesmen, representatives, peddlers or canvassers as the agents of the dealers, distributors, supervisors or employers under whom they operate or from whom they obtain the tangible personal property sold by them, whether in making sales on their own behalf or on behalf of the dealers, distributors, supervisors or employers.

"12. 'Sale' means any transfer of title or possession, or both, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatever, of tangible personal property, for a consideration, and includes:

"(a) Any transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price.

"(b) The fabrication of tangible personal property for consumers who furnish either directly or indirectly the materials used in the fabrication work and the furnishing, preparing or serving for a consideration of any tangible personal property consumed on the premises of the person furnishing, preparing or serving such tangible personal property.

"13. 'Sale at retail' means a sale for any purpose other than for resale in the form of tangible personal property, but

'transfer of possession', 'lease' and 'rental' as used in the definition of 'sale' means only such transactions as are found upon investigation to be in lieu of sales as defined without the words 'lease or rental'.

\*  \*  \*  \*  \*  \*

"17. 'Wholesaler' or 'jobber' means any person who sells tangible personal property for resale and not for consumption by the purchaser. As amended Laws 1960, Ch. 21, § 1; Laws 1968, Ch. 89, § 84."

Any doubt as to the tax status of Swift in its dealings with the military customers is resolved by Section 42–1312, subsec. D, A.R.S.:

"D. The sale to hotels, restaurants, dining cars, lunch rooms, boarding houses, or similar establishments of articles used by human beings for food, drink or condiment, whether simple, mixed or compounded, where such articles are customarily prepared and served to patrons for consumption on the premises or on such dining cars, shall be deemed wholesale sales as to such commodities, and the person who then resells such commodities in cooked or prepared form shall be deemed to be engaged in the business classified in § 42–1313. As amended Laws 1967, 3rd S.S., Ch. 8, § 1."

Section 42–1313, A.R.S., referred to in § 1312, places the tax obligation on the resellers of the food commodities[3]:

"§ 42–1313.  Sales by establishments preparing foods for consumption on premises; distribution

"The tax imposed by subsection A of § 42–1309 shall be levied and collected at an amount equal to two per cent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the business of conducting restaurants, dining cars, dining rooms, lunchrooms,

lunchstands, soda fountains or similar establishments where articles of food or drink are sold for consumption on the premises or on such dining cars. As amended Laws 1965, 3rd S.S., Ch. 3, § 1. Effective June 29, 1965."

Thus, the transactions between Swift and the military stores and restaurants were intended for resale to the authorized customers of such facilities for a consideration within the definition of "sale" in § 42–1301, subsec. 12, supra.

It is manifest that Swift was engaged in the business of wholesaling under the plain terms of the Transfer Privilege Tax Statutes.

The Commission contends that certain regulations, promulgated by it in 1956, under the authority of § 42–1305, A.R.S., transform Swift's status from wholesaler to retailer in these particular dealings with the military facilities. The pertinent regulations follow:

"2.18  *Sales to the United States*

"All sales to the United States government, its departments, or agencies, are retail sales, being sales to a consumer, and vendors making such sales are required to report and pay the tax thereon as retail sales. \* \* \*.

"2.18.3  *Post Exchange or Canteens in Federal Areas*

"A sale to a post exchange or canteen operated as a Federal instrumentality is deemed to be a sale to a consumer and is therefore subject to the Transaction Tax less the 50% deduction. Even though the PX or canteen resells most of the products purchased, as a Federal instrumentality it is not required to be licensed or to report and pay a tax on such sales either pursuant to the Transaction or Use Taxes.

"2.18.4  *Officer's Clubs in Federal Area*

"Officer's clubs, non-commissioned officer's clubs, and other clubs of military

---

3. The parties here concede that these military retailers are immune from this tax under the authority expressed in Standard Oil of Calif. v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611.

personnel operated in a Federal area are deemed to be purchasers and consumers for their members and are not engaging in business or in making sales at retail in the ordinary course of business. Sales made to such clubs are sales at retail subject to the 50% deduction."

The above regulations are based, in part, on § 1321 subsecs. B and C, A.R.S.:

"B. After June 30, 1956, the provisions of this article shall not apply to sales made directly:

"1. To the United States government, its departments or agencies by a manufacturer, modifier, assembler or repairer.

"2. To a manufacturer, modifier, assembler or repairer when such sales are of any ingredient or component part of products sold directly to the United States government, its departments or agencies by the manufacturer, modifier, assembler or repairer.

"C. After June 30, 1956, there shall be deducted from the annual privilege tax fifty per cent of the amount of tax levied under the provisions of § 42–1312 upon any sale of tangible personal property made directly to the United States government, its departments or agencies, which is not exempt under the provisions of subsection B of this section."

■ Swift's type of business is expressly excluded from the foregoing exemption by subsections F and G of § 1321, A.R.S. But the Commission, by its regulations, attempts to place it within the 50-percent deduction clause, supra, by "deeming" the sales as retail and not wholesale. Subsection C, however, by its very terms, applies only to those who would otherwise be taxable at the full rate under § 1312, A.R.S. and Swift, as we pointed out above, is exempt under that section.

■ The legislature obviously intended to decrease both the tax base and tax rate in a certain area of transactions involving the United States Government. The Commission, on the other hand, attempted to broaden the tax base by placing an other-wise exempt business within the tax-deduction clause contrary to the plain language of the Transaction Tax Article. This it cannot do. In Hunt v. Norton, 68 Ariz. 1, 198 P.2d 124, 5 A.L.R.2d 668, this Court stated:

"Chairman Hunt of the Tax Commission practically conceded, at the hearing, that no true emergency existed but nevertheless the petition was thereafter allowed by the Commission. If the limitation statute is oppressive or unworkable, relief lies with the legislative department, as the members of the Commission have no right to shut their eyes to plain provisions of the statute."

The legislature, either intentionally or inadvertently, allowed a tax gap. Had it wished to foreclose the exemption it could have done so by providing that the tax be levied on the last taxable sale, whether wholesale or retail; or by other plain language directed to the problem involved here. The legislature has not done so, and the Commission cannot legislate for it.

■ It is fundamental in administrative law that an administrative agency or commission must exercise its rule-making authority within the grant of legislative power as expressed in the enabling statutes. Any excursion by an administrative body beyond the legislative guidelines is treated as an usurpation of constitutional powers vested only in the major branch of government. General Electric Company v. Burton, 372 F.2d 108 (6th Cir.); Busey v. Deshler Hotel Co., 130 F.2d 187, 142 A.L.R. 563 (6th Cir.); 2 Am.Jur.2d, Administrative Law, § 211.

One other point remains on this particular question. The Commission contends that since the regulations have been in effect for more than eleven years, and that the legislature has been *presumably* aware of them, their validity has been established by this long period of acquiescence. In Long v. Dick, 87 Ariz. 25, 29, 347 P.2d 581, 583, 80 A.L.R.2d 949, we said:

"In our final conclusion in this case, we give controlling weight to the fact

that during this twelve-year period the members of the legislature were repeatedly made aware of the operation of the statute and must have known its administrative interpretation and application. Yet, no change of any material or substantial nature occurred in the method of computing daily attendance for high schools. In such circumstances, although the administrative interpretation is not binding upon us, in cases of serious doubt we will not adopt a different construction. Chee Lee v. Superior Court, 81 Ariz. 142, 147, 302 P.2d 529. Acquiescence in meaning over long periods of time, *if not manifestly erroneous,* will not be disturbed. Bohannan v. Corporation Commission, 82 Ariz. 299, 313 P.2d 379. We are impressed with the argument that a clearer indication of legislative intent can scarcely be found, and that there is here not merely acquiescence on the part of the legislature, but as a practical effect, an endorsement of administrative conduct. [Emphasis added.]

And in City of Mesa v. Killingsworth, 96 Ariz. 290, 394 P.2d 410, this Court stated:

"* * * This Court has held, on numerous occasions, that while administrative interpretation is not binding where long continued *and in cases of ambiguity* we will acquiesce therein. Long v. Dick, 87 Ariz. 25, 347 P.2d 581, 80 A.L.R.2d 949. [Emphasis added.] Id. at 96 Ariz. 296, 394 P.2d 414.

While in Long v. Dick, supra, it seems apparent that the legislature was aware of the administrative regulations, there are no facts presented here to support such presumption; and even a presumption of legislative acquiescence would be questionable.

"Contemporaneous construction is given special weight because usually the administrators who immediately upon enactment of a statute issue regulations giving meaning to the statute are normally highly informed about the legislative intent. The Supreme Court frequently overstates the effect given to long-standing rules: 'Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law.' Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L. Ed. 52 (1938), often quoted in later cases. The Supreme Court has said many times over many decades that an interpretation after a reenactment of the statute 'is deemed to possess implied legislative approval and to have the effect of law.' Commissioner v. Flowers, 326 U.S. 465, 469, 66 S.Ct. 250, 252, 90 L.Ed. 203 (1946). The reenactment doctrine is one of general application in all fields of administrative action, but it has been especially prominent in tax cases. The theory that congressional reenactment of a statute while regulations are outstanding means congressional adoption of the regulations is contrary to some of the plainest facts of life. The committees and even the subcommittees of Congress are often in fact wholly unaware of the outstanding regulations. Furthermore, Congress usually legislates only the main outlines, leaving details for administrative regulations; a reenactment of a main outline does not necessarily approve what the administrators have done in dealing with subject matter that is beyond the scope of what Congress deals with through legislation. Considerations of this kind have caused the Court to indicate from time to time that the reenactment rule is something less than an absolute. Chief Justice Warren quite accurately said for the Court in 1955 that 're-enactment * * * is an unreliable indicium at best.' Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431, 75 S.Ct. 473, 477, 99 L.Ed. 483 (1955). But the Court goes on stating the reenactment rule as if it were an absolute. E. g., Cammarano v. United States, 358 U.S. 498, 511, 79 S.Ct. 524,

532, 3 L.Ed.2d· 462 (1959)." Davis, Admin. Law and Govt., ch. 5, pp. 127–8 (West Pub. Co.)

■ But even presuming legislative awareness of the Commission's regulations affords scant support to the contentions ·of the Commission. Unlike the City of Mesa case, supra, there is no ambiguity in the provisions of the tax statutes here; and unlike Long v. Dick, supra, any acquiescence by the legislature, even if it were proved here, would be "manifestly erroneous" in the light of the clear and contrary language of the Transaction Tax Article.

Therefore the imposition of the Transaction Privilege Tax in the amount of $19,191.36, and paid under protest by Swift, was invalid.

■ Swift also claims that, contingent upon a decision that these sales are exempt from the Transaction Taxes, it is entitled to a refund of the initial payment, in the sum of $16,524.43, even though such payment was made without protest. Conceding that it did not follow the protest procedure set forth in § 42–1339, Swift relies on § 42–1326, contending that this section requires the Commission to make a refund. The section reads as follows:

"§ 42–1326. Refunds of excess payments.

"If, upon examination of a monthly return made under this article, it appears that an amount of tax has been paid in excess of the tax lawfully due, then the excess amount shall be credited against any tax then due from such taxpayer under any other monthly return. The commission, in its discretion, may issue to the taxpayer a credit voucher for any balance of the excess, or may, upon an audit of the taxpayer's accounts and records, refund to the taxpayer such amount as may be found due by issuing a certificate of overpayment and a claim for refund to the commissioner of finance which shall be investigated and approved by the attorney general. Upon approval, the commissioner of finance

shall draw a warrant in favor of the taxpayer against the state treasurer which shall be paid from the special privilege tax account, and an amount equivalent to the proportion of the tax paid in excess of the amount due which has been paid to a county shall be deducted from any amount thereafter to be paid under this article to the county and credited to the special privilege tax account. As amended Laws 1968, Ch. 89, § 86."

This question was decided by this Court in City of Phoenix v. Phoenix Newspapers, Inc., 100 Ariz. 189, 412 P.2d 693, where we denied the claim for a refund .under a City Ordinance which is almost identical to the provisions of the Transaction Privilege statutes involved here. We said:

"The general rule at common law is that voluntary payment of taxes without protest and not under duress cannot be recovered by the taxpayer if such payment was made through a mistake on the part of the taxpayer and was due to his own neglect. Apparently the rationale in tax cases follows the statement from Pitt v. City of Stamford, 117 Conn. 388, 167 A. 919, which reads as follows:

" 'To accord a right of recovery in every case where, after assessments have been made without appeal, budgets and tax rates predicated thereon, the taxes paid without objection or protest, and the moneys expended for the public purposes, it afterward develops that some mistake has been made in the assessment, would work disastrous results. It must of necessity be confined to extreme and exceptional cases.'

"But cf., Maricopa County v. Leppla, 89 Ariz. 220, 360 P.2d 227, 84 A.L.R.2d 1129.

"Section 16 of Ordinance G–93 provides, in part:

" 'If any person having made the return provided in such ordinance feels aggrieved by the assessment made upon

him for any month by the Collector, he shall pay the amount of such assessment before the delinquent date and shall at that time give notice to the Collector that all or part of such payment is made under protest.'

"Plaintiff admits the payments were not made under protest and were voluntarily made. It is too late for plaintiff to contend it is entitled to a credit for the taxes paid under Ordinance G–93. Recovery of taxes erroneously paid being a matter of legislative grace, statutory procedure must be complied with. Peterson v. Sundt, 67 Ariz. 312, 195 P. 2d 158.

"The appellant contends that Section 24 of Ordinance G–93, which provides that excess payments which have been made may be credited or returned by the collector, permits recovery of the taxes paid. The lower court, however, held that the tax was not one paid under a mistake but that it was voluntarily paid, and Section 24 does not apply to a three year audit. We agree, and since the taxing authority did not make a specific allowance for recovery as provided in Section 24, the holding of the lower court with respect to the denial of a recovery for taxes not paid under protest is affirmed. See Maricopa County v. Arizona Citrus Land Co., 55 Ariz. 234, 100 P.2d 587." Id. at 100 Ariz. 195, 412 P.2d 696–697.

Maricopa County v. Leppla, 89 Ariz. 220, 360 P.2d 227, 84 A.L.R.2d 1129, cited in City of Phoenix v. Phoenix Newspapers, supra, is readily distinguishable. There we approved a refund to a taxpayer who inadvertantly paid the same tax a second time.

"This is not a case where a tax obligation actually *existed* after the original payment by the taxpayer had been made. The second payment was purely gratuitous and constituted a receipt by the tax authority of money which it had not anticipated in any manner whatsoever, and for which there existed no ob-

ligation. Under no theory, of mistake or otherwise, was the taxpayer or its agent required to satisfy a non-existent obligation. * * * " Id. at 223, 360 P.2d at 229.

In the instant case the taxes were voluntarily paid without objection or protest, and the money expended for public purposes. Under City of Phoenix v. Phoenix Newspapers, supra, they are not recoverable.

Therefore, it is our decision that Swift is not entitled to a refund of that portion of the tax not paid under protest in compliance with § 42–1339.

The decision of the Court of Appeals is vacated. The judgment of the Superior Court is reversed, and the matter remanded for further proceedings consistent with this decision.

UDALL, C. J., LOCKWOOD, V. C. J., and STRUCKMEYER and HAYS, JJ., concur.