757 P.2d 80

**SHAMROCK FOODS COMPANY, an Arizona corporation, Plaintiff Counter–Defendant–Appellee,**

v.

**CITY OF PHOENIX, a municipal corporation of the State of Arizona, Defendant Counter–Claimant–Appellant.**

No. 1 CA–CIV 8790.

Court of Appeals of Arizona, Division 1, Department D.

March 3, 1987.

Jennings, Strouss & Salmon, Jefferson L. Lankford by Ann M. Dumenil, Phoenix, for plaintiff counter-defendant-appellee.

Roderick G. McDougall, City Atty. by Philip M. Haggerty, Sandra McGee and Janice Marquez, Phoenix, for defendant counter-claimant-appellant.

## OPINION

HAIRE, Judge.

Shamrock Foods Company (Shamrock) sought to recover from the City of Phoenix (the City) certain privilege license and use taxes arising from the operation of its Dairy and Foods divisions. On cross motions for summary judgment, the trial court ruled for Shamrock on all issues.

The City's appeal presents the following questions for our consideration: (1) whether the proceeds of Shamrock's sales to schools, private clubs, and other exempt organizations should be excluded from privilege license taxation; (2) whether the proceeds of Shamrock's sales of disposable paper and plastic products to restaurants and other food service businesses should be excluded from privilege license taxation; (3) whether Shamrock owed use taxes on its purchases of the reusable milk cases in which it delivered dairy products to its customers; (4) whether Shamrock is entitled to credit for municipal privilege taxes it paid to Arizona cities and towns other than Phoenix; (5) whether the proceeds of sales attributable to Shamrock's profit centers located outside Phoenix were exempt from privilege license taxation; and (6) whether this court should assess attorney's fees against the City as a penalty for pursuing a frivolous appeal. We state the facts nec-

essary to resolve these issues with our discussions below.

## I. BACKGROUND AND PROCEDURAL HISTORY

Shamrock includes the Shamrock Dairy Division (Dairy division) and the Shamrock Foods Division (Foods division), both of which operate in Arizona. At all times material to the litigation, the Dairy division manufactured and sold dairy products to grocery stores, restaurants, schools, private clubs, and various other organizations. Similarly, the Foods division distributed food and food-related products to restaurants, cafeterias, hotels, schools, private clubs, and various service, fraternal, governmental and other organizations in Arizona.

The City audited the Dairy and Foods divisions for the period from September 1, 1979, through August 31, 1982, and assessed additional privilege license taxes, use taxes, and interest against them. Shamrock exhausted its administrative remedies with the City and, after paying taxes and interest under protest, commenced this action seeking a refund. The City counterclaimed for additional taxes and interest on several grounds on which Shamrock had prevailed at the administrative level.

The parties filed cross motions for summary judgment concerning all claims and counterclaims. The trial court ruled in Shamrock's favor on all issues and later entered formal judgment against the City. The City timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B).

## II. SALES TO SCHOOLS, PRIVATE CLUBS, AND OTHER ORGANIZATIONS

Most of the schools that purchased dairy products from Shamrock and all schools that purchased food products from Shamrock operated cafeterias that regularly served meals to students. All the schools employed cooks, and many employed full-time food directors and dietitians. The schools had kitchen facilities and served

meals in their own lunchrooms. Each school received compensation for school lunches from students and from various governmental sources. The meals sold to the students included the dairy and food products purchased from Shamrock. Some of the schools that purchased milk from Shamrock did not offer hot lunches, but sold Shamrock milk to students.

Shamrock also sold dairy and food items to private clubs, including country clubs and military base clubs. Each club operated kitchen and dining facilities, employed cooks, and served food to its members. The members of the clubs paid for the dairy and food items served by the clubs.[1]

Shamrock also sold food and dairy products to organizations including nursing homes, sororities and fraternities, summer camps, senior citizen centers, preschools and child care centers, governmental entities, commercial food service businesses, and various other organizations including the Arizona Desert Museum, the University of Arizona Student Union, and ARA, a commercial food service business that ran kitchen and dining facilities for the Cochise County jail, Tucson General Hospital, and the Mesa Senior Center (hereinafter collectively referred to as "exempt organizations"). Each of these organizations maintained dining facilities, cafeterias, lunchrooms, snack bars, or similar facilities that employed food service personnel. Each organization resold the food or dairy products it purchased from Shamrock to food service patrons or to the management of the facility in question.

*(a) Sales to Exempt Organizations before July 1980*

■ Former Phoenix City Code § 14–2(a)(8) imposed a privilege license tax on "[s]elling any tangible personal property whatsoever at retail." Phoenix City Code § 14–1 defined "retail sale" or "sale at retail" as a "sale of tangible personal property for any purpose other than the resale thereof." These provisions were in effect for the portion of the audit covering the time from September 1979 to June 1980.

In ruling on the parties' cross motions for summary judgment, the trial court found that the sales to the exempt organizations before July 1980 were not subject to the privilege license tax. The court found that the sales were wholesale sales and, therefore, were not subject to a tax as a retail sale.

The City now argues this judgment was error. It asserts that Shamrock produced "no evidence that these schools, or other entities actually resold the purchased products to their members, students, etc." The City further argues, without citation of authority, that organizations like fraternities and day camps, which provide meals to their members or patrons and allocate a portion of their overall charges to food expenses, do not engage in "resales" of food products. The City also argues that public schools do not "resell" food at retail to the extent they receive government subsidies in return for school lunches they provide.[2] The City urges in conclusion that the factual record before the trial court was insufficient to justify the ruling in favor of Shamrock on its sales to exempt organizations before July 1980.

The City did not raise the above arguments in the trial court. In its response to motion for summary judgment and cross motion for summary judgment, the City argued that Shamrock's sales to the exempt organizations constituted sales at retail because the organizations were not "in the business" of selling food at retail. The quoted language was the City's entire analysis on that point. When it submitted its response to Shamrock's motion for summary judgment and its cross motion for summary judgment, the City did not include a statement of facts as required by

---

1. The City did not assess tax liability for sales by the Foods division to private clubs from September 1979 to June 1980, but assessed deficiencies based on sales to the clubs from July 1980 to August 1982, the end of the audit period.

2. We note, however, that in a different section of its Opening Brief the City characterizes Shamrock's sales to the exempt organizations as "sales that would normally have been exempt as sales for resale by restaurants."

Maricopa County Local Rule 3.2(g) and Uniform Rule IV(f). Nowhere in the record did the City attack Shamrock's statement of facts in support of its motion for summary judgment as being insufficient to establish any of the exempt organizations' dispositions of food or dairy products as retail sales. Nor did the City argue that receiving indirect compensation or government subsidies in return for serving food could not constitute selling food at retail.

On appeal an appellant may not assert arguments it failed to make in the trial court. *Stratton v. Inspiration Consolidated Copper Co.*, 140 Ariz. 528, 530, 683 P.2d 327, 329 (App.1984); *Sullins v. Third and Catalina Construction Partnership*, 124 Ariz. 114, 120, 602 P.2d 495, 501 (App. 1979); *Crook v. Anderson*, 115 Ariz. 402, 403–04, 565 P.2d 908, 909–10 (App.1977). We accordingly decline to consider the City's challenge to that portion of the trial court's ruling that granted summary judgment in favor of Shamrock concerning its sales to the exempt organizations before July 1980.

*(b) Sales to Exempt Organizations from July 1980 through August 1982*

■ We preface our discussion of this issue with some pertinent historical background. In 1969, the Arizona Supreme Court invalidated regulations of the State Tax Commission that dealt with the state's transaction privilege tax on retail sales.[3] *Swift & Co. v. State Tax Commission*, 105 Ariz. 226, 462 P.2d 775 (1969). The regulations imposed the transaction privilege tax on wholesale sales to military retailers that were exempt from the tax by "deeming" the sales to be sales at retail.[4]

In *Swift*, the court ruled that the statutes explicitly imposed the transaction privilege tax only on retailers. The court acknowledged that the legislature had allowed a tax gap, either intentionally or inadvertently. Because the legislature had not acted to close the gap, the court ruled that the tax commission could not act as a legislature and artificially declare wholesalers to be retailers in order to impose the tax.

Perhaps in response to *Swift*, the City of Phoenix later adopted City Code §§ 14–2(a)(10)[5] and 14–44.2(b),[6] effective July 1, 1980. These ordinances accomplished through legislation what the State Tax Commission attempted to accomplish through regulation. Section 14–44.2(b) artificially designates wholesale sales to exempt organizations as retail sales in order to impose the City's privilege tax under § 14–2(a)(10). This artificial designation applies even though the exempt organizations may later resell the property.

The imposition of the privilege tax under § 14–2(a)(10) is subject to the provisions of § 14–44.3[7] and Regulation No. 14–44.3.1[8]

---

3. A.R.S. §§ 42–1301, 42–1309, 42–1312, and 42–1313.

4. Shamrock aptly characterizes the regulations invalidated in *Swift* as attempting to "upstream" transaction privilege tax liability from the exempt retailer to the wholesaler.

5. Section 14–2(a)(10) imposes a one percent privilege tax on the business of "[s]elling any tangible personal property whatsoever at retail, subject to the provisions of Section 14–44.3 relative to retail sales of food and exemptions therefor, and Regulation No. 14–44.3.1."

6. In pertinent part, Phoenix City Code § 14–44.2(b) provides as follows:
   "Sales or leases of tangible personal property to exempt organizations, clubs, public educational entities, governmental entities and non-licensed businesses shall be deemed retail sales or leases for the purpose of the imposition of taxes under Section 14–2, notwith-

standing that such property may in fact be resold or re-leased by the acquiring person to others."

7. The pertinent provisions of Phoenix City Code § 14–44.3 read as follows:
   "(a) In this Section, unless the context otherwise requires, the following definitions shall be applicable:
   \* \* \* \* \* \*
   "(3) '*Food*' means any food items intended for human consumption which is intended for home consumption as defined by rules and regulations adopted by the Department of Revenue, State of Arizona, pursuant to A.R.S. § 42–1387. Until such regulations are adopted and promulgated by the Department of Revenue, the Collector shall be guided by ordinary and reasonable meaning of the terms herein.
   "(b) Except for the gross income from the sale of food for consumption on the premises,

regarding retail sale of food. Section 14–44.3(b)(3) provides an exemption to the privilege tax for sales of food by retailers who do not provide facilities for the consumption of food on the premises. As it is used in § 14–44.3, " '[f]ood' means any food items intended for human consumption which is intended for home consumption...." Phoenix City Code § 14–44.3(a)(3).

Regulation No. 14–44.3.1 recognizes an exemption from the privilege tax for wholesale sales of food to restaurants and other similar "food service businesses" defined in City Code § 14–2(a)(7). This exemption arises because the privilege tax attaches when the restaurant resells the food to its customers.

The effect of the ordinances and regulations can be summarized as follows. The privilege tax artificially applies to wholesale sales of food to exempt organizations even if the organizations resell the food. If, however, the organization is a "food service business" under § 14–2(a)(7), the sale to the organization is exempt because the privilege tax attaches when the food service business resells the food to the customer. The privilege tax does not artificially apply to a wholesale sale to an exempt organization that makes retail sales of food "intended for home consumption" and that also does not provide facilities for the consumption of food on the premises. "Home consumption" is defined either by the rules and regulations of the Arizona Department of Revenue or by the reasonable meaning of the phrase.

In granting summary judgment for Shamrock, the trial court engaged in an analysis similar to that which we have done above. The trial court noted that although Shamrock is not a retailer under most of the provisions of the revenue code, it was artificially designated a retailer under § 14–44.2, the section that addresses exempt organizations. Consequently, the court held, Shamrock was entitled to the exemption under § 14–44.3(b)(3) because it did not provide or make available any eating facilities on its premises.

On appeal, the City acknowledges that Shamrock does not have eating facilities on its premises but now argues that Shamrock cannot use the exemption under Phoenix City Code § 14–44.3(b)(3) because the items sold were not "intended for home consumption." We do not need to address the merits of this argument, however, because the City did not raise it at the trial level. In its response to the motion for summary judgment, the City argued that § 14–44.3(b)(3) did not apply because the sales "are not sales of food pursuant to the definition of § 14–44.3(a)(3)." It did not, however, indicate that the sales did not involve food under § 14–44.3(a)(3) because the food was not "intended for home consumption." The City's one ambiguous reference to § 14–44.3(a)(3) did not appropriately raise the issue before the trial court.

We affirm the decision of the trial court on this issue.

## III. SALES OF PAPER AND PLASTIC PRODUCTS TO RESTAURANTS AND OTHER FOOD SERVICE BUSINESSES

During the period in question Shamrock sold disposable paper and plastic prod-

---

the taxes imposed by the Chapter 1 of the Privilege License Tax Code do not apply to the gross income from the sale of food by any of the following:

\* \* \* \* \* \*

"(3) A retailer who sells food and does not provide or make available any facilities for the consumption of food on the premises."

8. The pertinent provision of Regulation 14–44.3.1 provides as follows:

"(a) The sale of food by a food service business within the categories described in Section 14–2(a)(7) is normally food for resale and therefore exempt...."

Section 14–2(a)(7) defines a "food service business" as follows:

"(7) Preparing and selling food or beverages in bars, cocktail lounges, restaurants, dining cars, dining rooms, lunch rooms, lunch stands, soda fountains or similar establishments where articles of food or drink are sold for consumption on or off the premises or on or off such dining cars subject to the provisions of Section 14–44.3 relative to retail sales of food and exemptions therefor, and Regulation No. 14–44.3.1."

ucts to restaurants and similar food service businesses. These products consisted of beverage cups and lids, paper napkins, drinking straws, plastic knives, forks and spoons, paper plates, paper bags, cardboard trays and other similar items. The restaurants and food service businesses that bought the paper and plastic products from Shamrock furnished them. to their customers with the meals they sold. The restaurants and food service businesses included the cost of those products in setting the retail prices for their food products.

In granting summary judgment for Shamrock, the trial court ruled that Shamrock's sales of paper and plastic products were outside the scope of the Phoenix privilege tax because they were sales for resale. The trial court found that the paper and plastic products became "a part of the sale of food items" because the customer purchased the food and "the necessary paper products to carry or handle or eat that particular food item." Because the products became part of the food items, the court concluded that they were resold to the consumer and, therefore, were not subject to the tax.

The City now contends that the trial court erred in so ruling. It argues that none of the paper and plastic products Shamrock sold to the restaurants were sales for resale, relying primarily on *Sta–Ru Corp. v. Mahin*, 64 Ill.2d 330, 1 Ill.Dec. 67, 356 N.E.2d 67 (1976). In that case, the Illinois Supreme Court considered the question of whether paper and plastic items the plaintiff bought and used to contain foods and beverages consumed on the premises by plaintiff's customers were sold to plaintiff at retail and therefore subject to the retailers' occupation tax. Reversing the lower appellate court's decision, reported at 34 Ill.App.3d 653, 338 N.E.2d 906 (1975), the Illinois Supreme Court held that they were, reasoning as follows:

"No separate charge is made by Sta–Ru for the disposable containers furnished its customers. Obviously, Sta–Ru is in the business of selling food and beverages, not disposable containers, and it is the food or beverage which its customers come to purchase. As in *American Airlines [, Inc. v. Department of Revenue*, 58 Ill.2d 251, 319 N.E.2d 28 (1974)] and *[Theo. B.] Robertson Products [Co. v. Nudelman*, 389 Ill. 281, 59 N.E.2d 655, 157 A.L.R. 553 (1945)], Sta–Ru provides the plastic and paper containers as a part of its standard method of doing business. There is no resale of the containers to the customers within the meaning of the ROTA [Retailers' Occupation Tax Act]. Rather, the cost of the containers used to serve food on its premises is a cost of doing business as would be the cost of permanent dinnerware.

"Sta–Ru's contention that the containers are resold since their ownership is transferred to the customer with no right in Sta–Ru to reclaim possession is hardly convincing. Beyond the fact that no separate consideration is paid for the containers, it is conceded that the containers are not reusable. The customer acquires nothing of permanent benefit." *Sta–Ru*, 64 Ill.2d at 336–37, 1 Ill.Dec. at 70, 356 N.E.2d at 70.

The analysis advanced in *Sta–Ru* has not been universally accepted. In *Macke Co. v. Comptroller of the Treasury*, 302 Md. 18, 485 A.2d 254 (1984), Maryland's use tax statute contained an exemption for tangible personal property purchased for resale in the same form as it was received by the taxpayer. The taxpayer in *Macke* operated cafeterias which sold food using paper plates, cups, bowls and lids, and provided eating areas supplied with paper napkins, paper bags, plastic utensils, stirrers, and straws that were available both to purchasers and non-purchasers of cafeteria food. The court held that the plates, cups, bowls and lids were resold by the taxpayer and accordingly were not subject to the use tax. In so holding, the court recognized that customers of the taxpayer bought the food and accompanying container as a unit, and that either component would be relatively valueless if sold separately. The court stated:

"The consumer understands this. He realizes that after he eats the food, he owns the paper container and may treat it as he pleases. He can throw it away

or take it home and plant flowers in it, but he need not return it to Macke. It is wholly unrealistic to state that when vendors sell soup in paper bowls or hamburgers in styrofoam containers, they have sold the edible portions but not the containers or wrappers." *Macke Co.*, 302 Md. at 24, 485 A.2d at 257–58.

The *Macke* court identified *Sta–Ru Corp. v. Mahin* as in the minority on this point, and criticized its failure to recognize that food sold to a consumer is relatively valueless if no containers are provided for carrying and consuming it.

One of the decisions the *Macke* court counted in the majority on the general question before it was our supreme court's decision in *Moore v. Arizona Box Co.*, 59 Ariz. 262, 126 P.2d 305 (1942). There the court held that the taxpayer, a manufacturer of wooden boxes and crates used for shipping produce, was not subject to a two percent retailer's sales tax on its sales of such containers to produce packers. The court stated:

"It is obvious in the present case that the container is purchased by the packer only for the purpose of passing on together with the fruit or vegetable; that it cannot be used in any other practical manner, and that without the container the packer's business would be ruined and his product, for all practical intents and purposes so far as resale is concerned, valueless." *Moore*, 59 Ariz. at 268, 126 P.2d at 308.

It held:

"[I]f the container adds to the value of the finished product when sold in it, as compared with its value for sale without the container, then the container itself is sold to the retailer for the purpose of resale and is not subject to tax as an original retail sale." *Id.*, 59 Ariz. at 267–68, 126 P.2d at 308.

*See Burger King, Inc. v. State Tax Commission*, 51 N.Y.2d 614, 435 N.Y.S.2d 614, 416 N.E.2d 1024 (1980) (hamburger wrappers, beverage cups and french-fry "sleeves" held purchased "for resale as such"); *Paper Products Co., Inc. v. City of Pittsburgh*, 391 Pa. 87, 137 A.2d 253 (1958) (sales of container, wrapping paper and packaging materials to vendors who used them in direct connection with the sale of their products without a specific charge were non-taxable sales at wholesale). We find the reasoning of this line of cases more persuasive than that of *Sta–Ru*, and in any event are bound to follow the holding of our supreme court in *Moore v. Arizona Box Co.* Accordingly, the trial court did not err to the extent it held that Shamrock's sales of paper and plastic products actually and necessarily used by restaurants to contain the food and beverages they sell to their customers were not subject to Phoenix's privilege license tax.

Shamrock's sales of non-container paper and plastic products like paper napkins and coffee stirrers, however, are not within the holding of *Moore*, and should properly be treated differently. In *Celestial Food of Massapequa County v. State Tax Commission*, 63 N.Y.2d 1020, 484 N.Y.S.2d 509, 473 N.E.2d 737 (1984), the New York Court of Appeals declined to extend its earlier decision in *Burger King* to sales of paper napkins, plastic utensils, straws, and other such non-container items. The court stated:

"Whereas a cup of coffee cannot be purchased without a container, the same cannot be said of napkins, stirrers and utensils, which are more akin to items of overhead, enhancing the comfort of restaurant patrons consuming the food products.... Although the cost of such items may well be taken into account by the restauranteur when setting the price of food, so are other amenities a restaurant patron expects, such as service, utilities and fixtures, which do not become a part of the product being sold merely because their cost is a factor in determining the price a customer pays. Only when, as in *Burger King*, such items are necessary to contain the product for delivery can they be considered a critical element of the product sold, and excluded from sales tax." *Celestial Food*, 63 N.Y.2d at 1022, 484 N.Y.S.2d 509, 473 N.E.2d at 738.

*Accord Macke*, 302 Md. 18, 485 A.2d 254. This analysis is fully consistent with the

reasoning of *Moore v. Arizona Box Co.*, and we concur in it. We accordingly reverse the judgment below to the extent it held that Shamrock's sales of paper napkins, straws, coffee stirrers, plastic utensils and other non-container products to restaurants and other food service businesses were not subject to Phoenix privilege license taxation.[9]

Shamrock nevertheless claims support from Phoenix City Code § 14–40(s), which exempts from privilege license taxation the sale of food, drink, condiments and "accessory tangible personal property" to school districts. It also finds support from Regulation No. 14–40.5, which defines "accessory tangible personal property" to include "all disposable items such as paper plates, plastic eating utensils, napkins, paper cups, drinking straws, sacks or other containers in which such school lunches are served, provided or otherwise contained." Section 14–40(s) was not adopted until August 1982, and, as Shamrock tacitly recognizes, is for that reason not directly applicable in this case. Moreover, the City's adoption of that section provides only equivocal support for Shamrock's position here. Section 14–40(s) may as reasonably be viewed as an abrupt change in prior law as it may be interpreted as a confirmation or repetition thereof.

## IV. SHAMROCK'S USE TAX LIABILITY FOR PURCHASES OF WIRE AND PLASTIC MILK CASES

■ During the taxable period in question, Shamrock's Dairy division purchased and used milk cases in manufacturing and selling milk and related dairy products. The milk cases, which were either metal or plastic, were shaped like a box and had no individual compartments. Each milk case held 24 half-gallons of milk or different numbers of other sizes of dairy product containers. Aside from ice cream, Shamrock always delivered its dairy products in milk cases regardless of the quantity ordered by the customer.

Although Shamrock charged no deposit on the milk cases, its customers generally returned empty milk cases to it for reuse. Shamrock's drivers would pick up the empty milk cases at its customers' places of business. Shamrock did not keep track of the number of milk cases returned. It neither charged its customers for milk cases that were not returned nor allowed credit for those that were. Shamrock included a part of the cost of milk cases in the standard prices it charged for its dairy products.

The milk cases were filled mechanically as part of the manufacturing process. From the back dock of Shamrock's plant, the cases were placed on a conveyer belt that ran them through a washing machine. Once clean, they continued along the conveyor belt and were automatically packed with containers of dairy products and then stacked and moved into cold storage. They were then delivered to Shamrock's customers.

For the period in question in this case, the City assessed against Shamrock use taxes and interest claimed to be owing under Phoenix City Code § 14–49 as a result of Shamrock's purchases of milk cases. Shamrock disputed the assessment, contending that the milk cases were exempt under Phoenix City Code § 14–50(a)(8)[10] because they were "an ingredient or component part" of the dairy product. The trial court granted summary judgment for Shamrock on that issue, concluding that

---

9. Shamrock has attached as an appendix to its answering brief a copy of Arizona Department of Revenue Sales Tax Ruling No. 15–17–80, dated September 1, 1980, which states that sales of paper products like "bags, boxes, disposable cups and napkins" by a supplier to a restaurant or snack bar constitute sales for resale which are exempt from state transaction privilege taxation. Neither the applicability nor the correctness of this administrative opinion are properly before us in this case.

10. Phoenix City Code § 14–50(a)(8) provides an exemption for the following:

"Property purchased by manufacturers of tangible personal property which directly enters into and becomes an ingredient or a component part of the manufactured, fabricated or processed article, substance or commodity manufactured by the purchaser for sale in the regular course of business."

the milk cases "become an integral part of the milk product."

The City urges that the trial court erred in holding the milk cases exempt from use taxation. We agree. Under the plain meaning of the words of § 14–50(a)(8), the milk cases were clearly not exempt. The "article, substance or commodity" Shamrock manufactured and sold was milk and other dairy products in paper or plastic containers. The milk cases did not "directly enter into" or become an "ingredient" or "component part" of the dairy products merely because they had been washed, loaded, and stacked by machine. For the milk cases to be exempt, they would have to bear the same relationship to the milk and dairy products as fenders do to cars, or as dye does to fabric, or as transistors do to radios. But the milk cases simply do not. Indeed, the descriptions contained in the record concerning the way in which Shamrock used and reused these milk cases make it plain that they actually functioned as equipment in Shamrock's dairy product delivery system, much like conveyor belts and handtrucks. The regular circulation of the milk cases between Shamrock and its customers further supports this view, and the fact that Shamrock found it unnecessary to expend resources in accounting for their location and number certainly does not detract from it.

Shamrock cites only one case as authority for its interpretation of § 14–50(a)(8). *Zoller Brewing Co. v. State Tax Commission,* 232 Iowa 1104, 5 N.W.2d 643, *modified and rehearing denied,* 6 N.W.2d 843 (1942). In *Zoller,* a brewer sold beer in bottles, cartons, and kegs. It charged its customers separately for each bottle, carton, and keg and repurchased each for a lesser amount on return by the customer. The Iowa use tax statute excepted property used in processing, which it defined as any

tangible personal property, including containers, that was intended to become an integral part of tangible personal property ultimately to be sold at retail. The court held that a container necessarily became an integral part of a liquid product intended to be sold at retail and that the bottles, cartons, and kegs were not subject to the use tax.

*Zoller* is inapposite here. Unlike the Iowa use tax statute, the exemption provided by Phoenix City Code § 14–50(a)(8) does not specifically include containers as such. Moreover, and more importantly, the cartons that the *Zoller* court held exempt from use taxation were those in which bottles of beer are commonly sold at retail. Unlike the situation in *Zoller,* Shamrock's milk and other dairy products are removed from the milk cases in which they are delivered to Shamrock's customers and sold at retail in their individual paper or plastic containers. *Zoller* accordingly does not support Shamrock's position.

We reverse the decision of the trial court on this issue for the reasons discussed above.

## V. CREDIT UNDER A.R.S. § 42–1452 FOR TAXES PAID TO OTHER ARIZONA CITIES AND TOWNS

■ During the period in question, Shamrock paid municipal privilege taxes to Arizona cities and towns other than Phoenix. Shamrock determined which cities and towns it would make the tax payments to based on the locations of its customers. During the administrative hearings in this case, Shamrock and the City stipulated that if Senate Bill 1342 were enacted into law, it would apply to the parties' dispute regarding multiple municipal tax. In the spring of 1984, Senate Bill 1342 was enacted as A.R.S. § 42–1452,[11] which gives taxpayers

---

11. In pertinent part, A.R.S. § 42–1452 reads as follows:

"A. Except as otherwise provided in this section, a taxpayer who has paid transaction privilege taxes on a taxable transaction to an appropriate city or town is not required to pay transaction privilege taxes on the same transaction to any other city or town.
\* \* \* \* \* \*

"H. In this section:
"1. 'Appropriate city or town' means a city or town in this state:
"(a) In which the business sales office which generated the taxable transaction is located; or
"(b) In which the purchaser resides, is located or is situated at the time of the transaction; or

credit for transaction privilege taxes paid to another city or town for the same transaction.

The administrative hearing officer ruled that Shamrock was entitled to credit for municipal privilege taxes paid to appropriate cities or towns as defined in Senate Bill 1342. In its post-hearing memoranda before the administrative hearing officer, the City conceded that Shamrock was entitled to a credit or adjustment of the audit assessment to the extent it had paid municipal privilege taxes to an "appropriate city or town" as defined in Senate Bill 1342. The City challenged the hearing officer's ruling for Shamrock in its counterclaim in this case. The trial court granted summary judgment in favor of Shamrock on that point.

On appeal, the City now contends that the trial court erred in ruling for Shamrock. It argues that although Shamrock presented evidence establishing the amount of its overall payments of taxes to other Arizona cities and towns, it failed to establish that any of those payments were actually based on specific transactions which the City of Phoenix had also subjected to its privilege license tax. The City argues as follows:

"The burden is on Shamrock under the statute to show that in fact the dollars which it claims to have paid to 'other municipalities' in fact were paid to municipalities which impose a tax on this type of transaction, and in fact were the same dollars upon which Phoenix attempted to impose its tax. It utterly failed to meet that burden in either the hearing, or the Superior Court.

"This is not to say that it cannot meet this burden, it is a factual question and must be resolved on a trial of this particular issue, not by summary judgment."

We cannot agree with the City's argument. The parties did not dispute below that Shamrock paid municipal privilege tax-

es to other Arizona cities and towns based on the presence of Shamrock customers in those cities and towns. Each municipality was therefore an "appropriate city or town" by virtue of A.R.S. § 42–1452(H)(1)(b). Further, though the record appears to contain no direct assertion that Shamrock paid or was assessed Phoenix privilege license taxes on the same revenues on which it paid municipal privilege taxes to other cities and towns, the City's audit assessment implicitly took those revenues into account at all stages below. The City clearly recognized this fact in conceding before the administrative hearing officer that to the extent Shamrock had paid municipal privilege taxes to an "appropriate city or town," it was entitled to a credit or adjustment on its Phoenix privilege license taxes.

Accordingly, we affirm the decision of the trial court on this issue.

## VI. EXEMPTION OF SALES FROM PROFIT CENTERS OUTSIDE PHOENIX UNDER FORMER CITY CODE § 14–40(j)

During the time at issue, the Dairy division maintained branch offices, referred to internally as "profit centers", throughout Arizona. Each profit center maintained its own cold storage warehouse and had full-time employees. Shamrock's customers placed orders for dairy products either with Shamrock salesmen at the customer's locations or by calling in their orders to Shamrock's customer service center in Phoenix or to the regional profit center. The warehouses at Shamrock's profit centers outside Phoenix were stocked through bulk deliveries from Shamrock's plant in Phoenix.

The administrative hearing officer ruled that Shamrock qualified for the exemption provided in former Phoenix City Code § 14–40(j) [12] for sales from its profit cen-

---

"(c) Which imposes or claims the right to impose a transaction privilege tax on the transaction in question under its ordinance.
"2. 'Transaction privilege tax' means a municipal transaction privilege license tax, use tax or similar tax...."

12. Former Phoenix City Code § 14–40(j) provided as follows:
"The provisions of this article shall not apply
   *    *    *    *    *    *

**286**

ters outside Phoenix. The City challenged this ruling in its counterclaim in this action. The trial court ruled in favor of Shamrock on that issue.

On appeal the City contends the trial court's ruling was error. We cannot agree.

In order to qualify for the exemption under former Phoenix City Code § 14–40(j), Shamrock had to show that the transfer of the products occurred outside the City, the products were not taken from the stock within the city, and the customer placed the order outside the city. The parties do not dispute that Shamrock's customers received title and possession of dairy products on delivery at the customers' locations.

The City apparently argues that because the dairy products stored at the profit centers originated from the processing plant in Phoenix, they were, as a matter of law, taken from stock within the corporate limits of Phoenix and that, consequently, Shamrock did not meet the requirements of former § 14–40(j)(2). The City cites no authority for this argument, and we reject it.

The City's implicit interpretation of former § 14–40(j)(2) is inconsistent with its plain meaning. The dairy products in question may well have been transferred from Phoenix to the profit centers initially, but it is nonetheless true that they were actually "taken" from stock stored at regional profit centers outside Phoenix when they were ultimately delivered to Shamrock's customers. Even more importantly, the last paragraph of former § 14–40(j), which the City omits to discuss, expressly provides that "centralized purchasing and supply to out-of-city storehouses" will not render the exemption unavailable.

"(j) To gross proceeds of sales or gross income derived from the sale of tangible personal property when:
"(1) Transference of title and possession occur without the city, and
"(2) The stock from which such personal property was taken was not within the corporate limits of the city, and
"(3) The order for tangible personal property was placed without the corporate limits of the city.

The trial court correctly granted summary judgment for Shamrock on the City's counterclaim.

## VII.  ATTORNEY'S FEES

Shamrock argues that it is entitled to an award of attorney's fees under Rule 25, Arizona Rules of Civil Appellate Procedure, because the City's appeal is frivolous. Because we have reversed the judgment in part, we find that the appeal is not frivolous. *See Price v. Price*, 134 Ariz. 112, 114, 654 P.2d 46, 48 (App.1982). Accordingly, we deny Shamrock's request for attorney's fees on appeal.

Affirmed in part; reversed in part; remanded for further proceedings consistent with this opinion.

EUBANK, P.J., Department D, and GRANT, J., concur.

"For the purpose of this exemption it does not matter that all other indicia of business occur within the city, including, but not limited to, accounting, invoicing, payments, centralized purchasing and supply to out-of-city storehouses and out-of-city retail branch outlets from a primary storehouse within the city."