UNION PACIFIC RESOURCES
COMPANY, Appellant
(Plaintiff),

v.

STATE of Wyoming; Wyoming Department of Revenue; Earl Kabeiseman, in his official capacity as Director of the Wyoming Department of Revenue; Wyoming State Board of Equalization; Wyoming Tax Commission; Nancy D. Freudenthal, Marvin Applequist, II, and C.H. Brown, III, in their official capacities as members of the Wyoming State Board of Equalization and the Wyoming Tax Commission; Wyoming Department of Audit; Roger W. Dewey, in his capacity as Director of the Wyoming Department of Audit; Board of County Commissioners of the County of Uinta; Board of County Commissioners of the County of Sweetwater; Board of County Commissioners of the County of Laramie; Board of County Commissioners of the County of Carbon; Board of County Commissioners of the County of Crook; Board of County Commissioners of the County of Lincoln; and Board of County Commissioners of the County of Converse, Appellees (Defendants),

and

Board of County Commissioners of the County of Albany; Board of County Commissioners of the County of Big Horn; Board of County Commissioners of the County of Campbell; Board of County Commissioners of the County of Fremont; Board of County Commissioners of the County of Goshen; Board of County Commissioners of the County of Hot Springs; Board of County Commissioners of the County of Johnson; Board of County Commissioners of the County of Natrona; Board of County Commissioners of the County of Niobrara; Board of County Commissioners of the County of Park; Board of County Commissioners of the County of Platte; Board of County Commissioners of the County of Sheridan; Board of County Commissioners of the County of Sublette; Board of County Commissioners of the County of Teton; Board of County Commissioners of the County of Washakie; and Board of County Commissioners of the County of Weston, Appellees (Defendants/Intervenors).

No. 92–30.

Supreme Court of Wyoming.

Sept. 23, 1992.

Dennis W. Lancaster of Phillips, Lancaster & Thomas, P.C., Evanston, and Cynthia M. Lummis of Wiederspahn, Lummis & Liepas, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., and Michael L. Hubbard, Sr. Asst. Atty. Gen., for appellee State of Wyoming.

Bruce A. Salzburg and David D. Freudenthal of Herschler, Freudenthal, Salzburg, Bonds & Rideout, P.C., Cheyenne, and Peter C. Maxfield, Laramie, for appellee Counties.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

URBIGKIT, Justice.

This mineral tax assessment challenge was filed by a very large Wyoming corporate taxpayer in a district court declaratory judgment action. Complex issues were presented by this major oil and gas producer. The complaint named both county and state officials as defendants. As the appellant's brief states, this appeal "involves the proper method and manner in which the State, County and other named government officials * * * may value, audit, assess, collect and review taxes on Union Pacific Resources Company's * * * oil and gas production."

## I. ISSUES

District court summary judgment dismissal of the complaint provides the final order for this appeal. The issues stated by Union Pacific Resources Company are:

1) The District Court has jurisdiction to decide the issues raised in Appellant's Complaint and has the authority to grant the relief requested therein.

2) The District Court erred in granting Appellees' motions and dismissing Count I of Appellant's Complaint, which requests a judicial declaration that the wellhead is the proper point of valuation to determine the taxable value of Appellant's oil and gas production for the years 1984 to 1988, inclusive.

3) The District Court erred in granting Appellee's motions and in dismissing Count II of Appellant's Complaint which requests a judicial declaration that certain statutes of limitation and other time limitations, restrict the audit and tax collection authority of Appellees.

4) The District Court erred in granting Appellees' Motions and in dismissing Count III of the Appellant's Complaint which requests a judicial declaration that the "county contract audits" are unconstitutional, illegal, unauthorized and violative of public policy.

The appellee counties, which now include all twenty-three Wyoming counties, amplify the issues as:

A. Whether a declaratory judgment action filed by a mineral producer concerning the appropriate point of valuation for its production in prior years should be entertained when the producer has not first presented the issue to the State Board of Equalization?

i. Whether a declaratory judgment concerning point of valuation for mineral tax purposes is subject to a requirement of exhaustion of administrative remedies, or in the alternative, to the doctrine of primary jurisdiction?

B. Whether any statute of limitations prevents Wyoming counties from seeking out mineral production which was unreported for taxation in prior years?

i. Whether a record retention requirement established by rule or statute oper-

* Chief Justice at time of oral argument.

ates as a statutory bar to Wyoming's counties seeking out mineral production unreported in prior years?

ii. Whether the limitation on county assessors' collection of taxes on "omitted property" operates as a five-year[ ] statute of limitations preventing counties from seeking out mineral production unreported for taxation?

iii. Whether the eight-year statute of limitations contained in W.S. 1–3–105 operates to prevent counties from seeking out production unreported for taxation?

C. Whether the practice of Wyoming counties of hiring private firms to review production reports made by mineral producers to various governmental agencies pursuant to contracts which compensate them, in part, based upon a percentage of taxes collected is unlawful as without statutory authority, void as against public policy, or subject to state preemption?

i. Whether Wyoming counties have statutory authority to enter into contracts for the services provided by the so-called "County Contract Auditors?"

ii. Whether the contingent fee provision of such contracts renders them void as contrary to Wyoming public policy?

iii. Whether the creation of the Wyoming Department of Audit has preempted the counties' authority to contract for the services provided?

The State, addressing the subjects intrinsic to its function, simplifies by stating:

1. Is declaratory judgment available where the taxpayer has failed to exhaust administrative remedies relating to an administrative request for refund, an incomplete audit and an administrative assessment of taxes to which taxpayer did not respond?

2. Is there an applicable statute of limitations against the Board's authority to review allegations of improper assessment and remedy such improper assessment?

We find three differentiated subjects litigatively created by the pleadings: (a) taxation point of valuation for either or both oil and gas production taxable within either the Wyoming ad valorem or severance tax systems and the ancillary question of whether this issue should now be judicially addressed before the appellant, Union Pacific Resources Company (Taxpayer), exhausts state tax agency administrative remedies; (b) what statutes, among possible statutes, provide a statute of limitation for collection of unpaid taxes by governmental entities for prior years; and (c) legality of the board of county commissioners entering into contracts with fee based private companies who check records to establish the existence of unpaid ad valorem mineral taxes.

There is a preliminary question of the propriety of the district court's decision since the first two general issues remain undetermined, and perhaps all three, resulting from the summary judgment disposition with a procedural decision that a prior requirement for the litigant to first exhaust administrative remedies existed.

We concur with the district court regarding the first issue, disagree with its procedural disposition failing to decide the statute of limitation issue, and agree with what the district court recognized but perhaps did not determine for decision with reference to the third issue. Consequently, we affirm the district court in decision on the first issue. With recognition of the basic and pervasive content of the second issue and the third as well, authenticating need for early judicial resolution for statewide application, we now elect to resolve the issues in this initial appeal. These tax issues involve tens if not hundreds of millions of dollars of state and local government revenues.

## II. DECISION FROM WHICH APPEAL IS TAKEN

Following a complete course of cross pleadings, including motions to dismiss and motions for summary judgment, the district court issued a detailed and well-reasoned decision letter followed by an order of dismissal incorporating the decision letter. The order of dismissal dispositively stated:

ORDERED that the Motions be and the same are hereby generally granted, and that the Complaint be and is hereby dismissed, each of the parties to bear its own costs, and it is further

ORDERED that the Court's letter ruling of November 25, 1991, as amended, be and is hereby incorporated herein.

The decision letter, in consideration of the first issue—valuation point—determined that exhaustion of administrative remedies was required. Regarding the statute of limitation, it was considered to be a mixed issue of law and fact which should also wait primary and prior administrative agency review. The district court then determined that the county usage of the contingent fee contract with independent contracts to audit for tax underpayment was not illegal. Within the nature of the dismissal order, there is some question of whether the declaratory decision was made on the third issue in final form, although the decisional basis for resolution was clearly stated in the text of the decision letter.

We will conjunctively consider the umbrella issue of exhaustion of administrative remedies with each of the substantive issues presented on appeal.

## III. POINT DURING PRODUCTION AND PROCESSING FOR TAXATION VALUATION

█ The concept in disagreement about the point in place and time for valuation of mineral production identically relates to the ad valorem county tax and the state severance tax. Stripped of its complexities, the determination of point of valuation directly addresses authorized deductible expenses which ordinarily include hauling, piping and fuel tank batteries as well as general processing. A very large dollar amount is involved in tax valuation which is determinative of the resulting tax revenues. Within these present proceedings, large refunds or significant additional revenues may be created by any upstream or downstream change during production processing for the point of valuation.

Simplified in conceptualization is Taxpayer's argument that the valuation point is determinable consistently within the state for each source of production as a matter of law and essentially for oil that is the wellhead. Citing support from agency rules and case law, Taxpayer argues (at least for petroleum products to which this litigation is limited):

W.S. § 39–2–202 (1977) and Chapter XXI, Rules and Regulations of the Wyoming State Tax Commission and Board of Equalization (1986) established the mine mouth and wellhead as the points where taxable value is determined (point of valuation) and all transportation and processing costs downstream from the mine mouth and wellhead were to be deducted from the sales price to determine the taxable value of the gross produce. * * * However, even before 1986, the procedures and methods and guidelines for valuing minerals for tax purposes at the mine mouth and wellhead had been clearly spelled out in the case law developed by this Court.

Taxpayer then continues with a discussion of a January 6, 1989 Attorney General's opinion, which "attempted" to change the point of valuation from the mine mouth or wellhead to different points downstream in the production chain. The Taxpayer further advances the contention that the inappropriate Attorney General's opinion "was almost immediately suspended by Chapter 204, 1989, Session Laws of Wyoming."

To the inquiry of whether a fixed point as a matter of law could be or should be established statewide in one lawsuit without involvement of the responsible administrative agency, the district court provided a thoughtful analysis:

Although Plaintiff's tax accountants and attorneys have ingeniously attempted to structure a justiciable controversy concerning point of valuation of oil and gas, the issues which are raised are not new or unique. As Plaintiff points out in its brief, the applicable Wyoming statutes concerning taxation of oil and gas have for many years provided that the value of the oil and gas shall be fixed "at the

fair cash market value of the product at the mine or mining claim where produced, after the mining or production process is completed". Because oil and gas is seldom, if ever, sold as it comes out of the ground, both the Wyoming Legislature, as well as oil and gas producers and Executive branch tax collectors, have struggled over the years to determine when the mining or production process is complete. More pertinently, all of these actors have struggled to determine what portion of the sales price of oil and gas is attributable to costs of producing the product at the mine or mining claim and what portion of the sale price is not attributable to production. The former costs are not deductible from the purchase price; but the non production costs are deductible. When these kinds of disputes concerning the deductibility of costs have arisen, the determination of what is deductible and what is not deductible has always been entrusted to the Board of Equalization, subject to judicial review by the courts.

The present case is no different. Although the background for the case has been artfully created, this lawsuit has its genesis, in whole or in part, by reason of amended tax returns filed by the Plaintiff in which it is claimed that "processing and transportation costs" were "erroneously included" in "the fair cash market value of the mineral product" for the years 1987 and 1988.

It does not matter whether Plaintiff is requesting a refund or is not requesting a refund, the question of what is, or was, the fair cash market value of a mineral product is a question to be resolved in the first instance by the executive branch of government. In the event of dispute between the Department of Revenue and a taxpayer concerning such issues, resolution of the dispute is left to the Board of [Equalization].

We agree.

In order to understand the context and scope of this prior exhaustion of administrative remedies discussion, some delineation and discussion of the Wyoming tax structure is required. Significant functional changes have occurred in state agency organization since this court's comprehensive constitutional review in *Rocky Mountain Oil and Gas Ass'n v. State Bd. of Equalization*, 749 P.2d 221 (Wyo.1987). To be recognized are the two types of taxation which are applied against mineral production. Initially, there was the century-old ad valorem tax collected by the county and measured in the mineral value at production.[1] This tax was directly involved in *Rocky Mountain Oil and Gas Ass'n*, 749 P.2d 221, and this court's opinion in that case resulted in passage of a constitutional amendment which authenticated a differentiated schedule for assessment within the ad valorem taxation system. Wyo. Const. art. 15, § 11 (effective November 21, 1988).

The second general tax is the excise type severance tax normally constituting a state resource and, in part, put into a permanent fund investment for the state of Wyoming. *See* Wyo. Const. art. 15, § 19. Although both systems are derived from entirely different taxation concepts and generally go to separate governmental entities, there is great similarity and one significant difference. The difference is the levy for ad valorem property tax is established by the local mill levy equally applied, although within differentiated valuation concepts, to all taxable property in each county.[2] The excise type severance tax rate is either set by the constitution, Wyo. Const. art. 15, § 19, or by state statute through legislative enactment. The severance tax is a state revenue while the ad valorem tax is a

---

1. Exhaustive debate at the time of statehood developed over valuation of minerals for ad valorem taxation. The present system of taxation at full value when produced became the method adopted. *See* Journals and Debates of the Constitutional Convention of Wyoming at 646, 681 and 695 (1889).

2. Wyo. Const. art. 15, § 11 states that Wyoming has a three tier assessment valuation tax system with mineral production assessed at 100% of value, industrial properties reduced to 11.5% of value and all other properties, real or personal, assessed at 9.5% of value.

local tax where it is established and collected.

The similarity is that the same production quantity and the same mineral values apply to each tax. Furthermore, general revisory, audit and review jurisdiction are vested with a state agency, the State Board of Equalization, with the right of appeal to that agency from either the Department of Revenue for severance taxes or the county Board of Equalization for ad valorem taxes. Constitutionally established, it is provided by Wyo. Const. art. 15, § 9: "The legislature shall provide by law for a state board of equalization." Wyo. Const. art. 15, § 10 adds: "The duties of the state board shall be to equalize the valuation on all property in the several counties and such other duties as may be prescribed by law." Comprehensive and complex duties are statutorily provided. *See* Wyo.Stat. § 39–1–302 (Supp.1992), appointment of board; appointment of division administrators; additional employees; and Wyo.Stat. § 39–1–304 (Supp.1992), powers and purpose of board; removal. Wyo.Stat. § 39–1–304, by initiating statement, provides: "(a) The state board of equalization shall perform the duties specified in article 15, section 10 of the Wyoming constitution and shall hear appeals from county boards of equalization, review final decisions of the department on state excise taxes and review department assessments of property and tax determinations." The statute enumerates twenty-nine numbered duties, six of which have since been repealed.

The statutory process is established for an appeal to be taken from the State Board of Equalization to a district court pursuant to the provisions of the Wyoming Rules of Appellate Procedure relating to administrative agencies. W.R.A.P. 12, Judicial Review of Administrative Action, and subparts, Rules 12.01 through 12.12. The scope of review is provided by the Wyoming Administrative Procedure Act, Wyo. Stat. § 16–3–114 (1990). The procedure and test for review has been considered by this court in a significant number of recent appeals. *Burlington Northern R. Co. v. Wyoming State Bd. of Equalization*, 820 P.2d 993 (Wyo.1991); *Amax Coal Co. v. Wyoming State Bd. of Equalization*, 819 P.2d 834 (Wyo.1991); *Amax Coal Co. v. Wyoming State Bd. of Equalization*, 819 P.2d 825 (Wyo.1991); *General Chemical Corp. v. Wyoming State Bd. of Equalization*, 819 P.2d 418 (Wyo.1991).

Consequently, for the point of determination for tax valuation litigatively presented by this appeal, we consider whether exhaustion of administrative remedies may be required to determine, for example, whether a structured place in the operational process is required for all production which would be established either factually or by determination of law. If an identical point of valuation for all production is not established, then what system of rules can be applied to address the real dollar substance of this litigation, which are deductions as a cost before value is determined including transportation and processing? It is obvious beyond argument that differences in the incurred costs from wellhead to pipeline or tank battery exist from field to field and between gas and oil. *McDermott & Co. v. Hudson*, 370 P.2d 364 (Wyo.1962).

The State, in addressing these decisional anxieties, argues:

> The operation, supervision, and control of the statewide system of taxation is reserved solely to the administrative officers of the executive branch of government. Here, UPRC [Taxpayer] is attempting to bypass the administrative agencies and have the courts act as the Department of Audit, the Department of Revenue and the Board of Equalization.
>
> Whether or not UPRC's contentions and claim for refund are anything more than theoretical depends upon resolution of basic facts relating to UPRC's production. UPRC would have this Court intrude upon the fact-finding and administrative prerogative of the administrative agencies. UPRC would have this Court dictate how audits will be performed by the Department of Audit; how the Department of Revenue will assess; and foreclose all adjudicatory consideration of the issues by the Board of Equalization. UPRC's request "that the Department of Revenue shall process the

amended reports consistent with this judgment of this court; and that the audits be conducted consistent with this judgment", should be denied as advisory.

\* \* \* \* \* \*

The facts relating to State Defendants' motion for summary judgment for failure to exhaust administrative remedies are undisputed and uncontested:

1. UPRC filed affirmative requests for refund relating to production in 1987 and 1988 in eight different Wyoming counties, after an audit was commenced by the Department of Audit. However, counsel for UPRC has repeatedly asserted that UPRC by its complaint does not seek the "consequential relief of tax refunds." \* \* \*

2. The Department of Audit is currently auditing UPRC's production in Uinta County for 1984–1988. The audit is not complete[.] The amended returns relating to Uinta County were incorporated into the audit.

3. UPRC is requesting additional deductions from value which were not taken by UPRC in the original tax returns.

4. The Department of Revenue has not taken a final administrative action on the audit, nor on UPRC's request for refund.

5. The Board of Equalization has not taken any action on the matter.

6. With regard to the severance tax assessments relating to the allegations of nonreporting by County Commissioners, UPRC was assessed only after UPRC refused to respond to the allegations. Such assessments were appealed to the Board. There is no showing that such assessments involve the point of valuation question.

The "affirmative refund requests" filed with the Department of Revenue are very broad in nature. Each refund request involves a full calendar year of mineral production in eight Wyoming counties. For example, the 1987 refund request seeks additional deductions of $12,888,034 for processing and transpor-

tation costs incurred from the wellhead to the leaseline (lease costs) and an additional $14,096,472 for processing and transportation costs incurred beyond the leaseline up to the point of sale. \* \* \* The 1988 refund request seeks additional deductions of $10,390,030 for lease costs and an additional $15,419,600 in costs beyond the leaselines. The 1988 request for refund also seeks an additional $2,593,443 in subsequent year's adjustments.

Prior to legislative changes made by 1991 Wyo.Sess.Laws ch. 174, the Wyoming State Board of Equalization had administrative functions and duties relating to the Department of Revenue and Taxation. The 1991 enactment separated out the Board of Equalization by creating two different administrative agencies. The Board of Equalization became an independent quasi-judicial organization with constitutional and statutory duties to equalize valuation and decide disagreements regarding statutory provisions affecting the assessment, levy and collection of taxes. These responsibilities include both the ad valorem state taxation system which provides county funding and the severance tax system which provides state funding. Specific statutory direction is provided for the Board of Equalization to review all contentions of improper assessment. Wyo.Stat. § 39–1–304 states in part:

(a) The state board of equalization shall perform the duties specified in article 15, section 10 of the Wyoming constitution and shall hear appeals from county boards of equalization, review final decisions of the department on state excise taxes and review department assessments of property and tax determinations. In addition, the board shall:

\* \* \* \* \* \*

(iv) Decide all questions that may arise with reference to the construction of any statute affecting the assessment, levy and collection of taxes, in accordance with the rules, regulations, orders and instructions prescribed by the board;

\* \* \* \* \* \*

(xiv) Carefully examine into all cases wherein it is alleged that property subject to taxation has not been assessed or has been fraudulently, improperly, or unequally assessed, or the law in any manner evaded or violated, and cause to be instituted proceedings which will remedy improper or negligent administration of the tax laws of the state[.]

The constitutionally emplaced functional responsibilities of the State Board of Equalization in appellate review and the Department of Revenue organizationally by statute, as well as the county Board of Equalization in prior decision making, are certainly not subject to the present contest. This court is asked to determine whether the district court abused its discretion in recognizing and applying well developed rules involving exhaustion of administrative remedies. We do not find abuse of discretion to have occurred here.

An excellent starting point for analysis is provided by what may have been dictum, although well reasoned, by Justice Rooney in *Rocky Mountain Oil and Gas Ass'n v. State*, 645 P.2d 1163 (Wyo.1982) and the thoughtfully related recognition of Justice Thomas in dissent. Both authors have similarly considered a rule regarding exhaustion of administrative remedies, although clearly differing in attribution or application in that particular decision. Justice Rooney wrote:

[T]here is a restriction on the availability of a declaratory judgment action with reference to its applicability to administrative matters. Where the action would result in a prejudging of issues that should be decided in the first instance by an administrative body, it should not lie. This is because, if it be otherwise, all decisions by the several agencies could be bypassed, and the district court would be administering the activities of the executive branch of the government. *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); and *City of Cheyenne v. Sims*, Wyo., 521 P.2d 1347 (1974). This restriction on the scope of declaratory judgments is akin to the requirement that administrative remedies must be exhausted before judicial relief is available.

Accordingly, where the relief desired is in the nature of a substitution of judicial decision for that of the agency on issues pertaining to the administration of the subject matter for which the agency was created, the action should not be entertained.

*Rocky Mountain Oil and Gas Ass'n*, 645 P.2d at 1168. Justice Thomas responded:

The ground for disposition of this case which I would espouse is different from that proposed in the majority opinion, that proposed in the dissenting opinion of Chief Justice Rose, and that espoused by the appellees in their legal position. Furthermore, it is different from that relied upon by the district court, although the law is well established that we are permitted to affirm the district court on any proper ground. *Agar v. Kysar*, Wyo., 628 P.2d 1350 (1981); *Wightman v. American National Bank of Riverton*, Wyo., 610 P.2d 1001 (1980), and cases therein cited. I cannot overlook the obvious simply because it is not perceived as obvious by others. I would hold that the relief of a declaratory judgment is not available in this instance because of the failure of the appellants to exhaust an available administrative remedy.

*Rocky Mountain Oil and Gas Ass'n*, 645 P.2d at 1175, Thomas, J., dissenting, with whom Chief Justice Rose joined.

The citation by both authors of *City of Cheyenne v. Sims*, 521 P.2d 1347, 1349–50 (Wyo.1974) (footnotes omitted) provides the basic understanding we continue for decision in this case:

In absence of the original power of the courts to assess property or levy taxes— the original responsibility lying with the county assessor and county board of equalization—the doctrine of exhaustion of remedies as contrasted to the primary jurisdiction doctrine is applicable because when the sole original determination lies with another body than the courts it is proper to apply such doctrine.

\* \* \* \* \* \*

Declaratory judgment should not be used to usurp or replace specific administrative relief, particularly when the initial decision is committed to an administrative body. No reason has been pointed out to this court by the appellants why justice requires the exercise of declaratory judgment power in this case.

This court has carefully addressed the separate functions provided by the differentiated doctrines of primary jurisdiction and exhaustion of administrative remedies in *People v. Fremont Energy Corp.*, 651 P.2d 802, 810–11 (Wyo.1982) (quoting *United States v. Western Pac. R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)):

> "The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. [Citation.]"

A similar but shorter expression distinguishing the two doctrines is that:

> "Exhaustion applies where an agency alone has exclusive jurisdiction over the case; primary jurisdiction where both a court and an agency have the legal capacity to deal with the matter.
> * * * *"

See also *Scott v. Fagan*, 684 P.2d 805 (Wyo.1984) (regarding determination of an employment relationship) and *Kearney Lake, Land & Reservoir Co. v. Lake Desmet Reservoir Co.*, 487 P.2d 324 (Wyo. 1971).

It stands established, if anything can be certain, that the executive department's administrative agencies, including specifically the constitutionally defined State Board of Equalization, have an initial jurisdiction and that no exhaustion of administrative remedies has occurred in this case regarding the determination of the complex and fiscally significant valuation concepts for tax assessment. This court has, in a broad array of cases involving assessment and tax collection understanding, recognized a primary administrative agency function of the State Board of Equalization.[3]

---

3. *Exxon Corp. v. Wyoming State Bd. of Equalization*, 783 P.2d 685 (Wyo.1989), *cert. denied* 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); *AT & T Communications of the Mountain States, Inc. v. State Bd. of Equalization*, 768 P.2d 580 (Wyo.1989); *Pathfinder Mines Corp. v. State Bd. of Equalization*, 766 P.2d 531 (Wyo.1988); *Rocky Mountain Oil and Gas Ass'n v. State Bd.*, 749 P.2d 221; *Appeal of Paradise Valley Country Club*, 748 P.2d 298 (Wyo.1988); *Teton Valley Ranch v. State Bd. of Equalization*, 735 P.2d 107 (Wyo. 1987); *M & B Drilling and Const. Co., Inc. v. State Bd. of Equalization*, 706 P.2d 243 (Wyo. 1985); *State Bd. of Equalization v. Tenneco Oil Co.*, 694 P.2d 97 (Wyo.1985); *Wyoming Bd. of Equalization v. State ex rel. Basin Elec. Power Co-op.*, 637 P.2d 248 (Wyo.1981); *State Bd. of Equalization v. Cheyenne Newspapers, Inc.*, 611 P.2d 805 (Wyo.1980); *Appeal of Monolith Portland Midwest Co., Inc.*, 574 P.2d 757 (Wyo.1978); *Sims*, 521 P.2d 1347; *Weaver v. State Bd. of Equalization*, 511 P.2d 97 (Wyo.1973); *CF & I Steel Corp. v. State Bd. of Equalization*, 492 P.2d 529 (Wyo.1972); *State Bd. of Equalization v. Kansas–Nebraska Natural Gas Co.*, 457 P.2d 963 (Wyo.1969), *remand In re Use Tax Assessment No. 32950*, 491 P.2d 1232 (Wyo.1971); *Chicago, Burlington & Quincy R. Co. v. Bruch*, 400 P.2d 494 (Wyo.1965); *Scott Realty Co. v. State Bd. of Equalization*, 395 P.2d 289 (Wyo.1964); *Town of Pine Bluffs v. State Bd. of Equalization*, 79 Wyo. 262, 333 P.2d 700 (1958); *Walgreen Co. v. State Bd. of Equalization*, 62 Wyo. 288, 166 P.2d 960 (1946); *Manning & Martin v. State Bd. of Equalization*, 58 Wyo. 425, 133 P.2d 373 (1943); *State Bd. of Equalization v. Argo Oil Corp.*, 54 Wyo. 512, 94 P.2d 158 (1939). *See also State Bd. of Equalization v. Blind Bull Coal Co.*, 55 Wyo. 438, 101 P.2d 70 (1940); *State Bd. of Equalization of Wyoming v. Midwest Oil Co.*, 55 Wyo. 1, 94 P.2d 160 (1939); *State Bd. of Equalization of Wyoming v. Mountain Producers Corp.*, 55 Wyo. 3, 94 P.2d 160 (1939); *Midwest Hotel Co. v. State Bd. of Equalization*, 39 Wyo. 461, 273 P. 696 (1929); *Baker v. Paxton*, 29 Wyo. 500, 215 P. 257

■ Furthermore, significant law exists establishing the rule, which we now find meritorious, that the district court's election to decline jurisdiction on the basis of nonexhaustion of administrative remedies is vested in the sound exercise of its discretion. 4 Kenneth Culp Davis, *Administrative Law Treatise* § 26:1 (2d ed. 1983). See the discussion of discretion in exhaustion cases in *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) and *Park County Resource Council, Inc. v. United States Dept. of Agriculture*, 817 F.2d 609 (10th Cir.1987). Compare, in primary jurisdiction review, *Kearney Lake, Land & Reservoir Co.*, 487 P.2d at 328. The *Administrative Law Treatise* provides an interesting and thoughtfully relevant analysis:

> Exhaustion law is too complex for a meaningful simple statement of when exhaustion is required and when it is not, but clearly the courts generally do what they obviously should do—they weigh the reasons pulling in each direction and decide whether requiring exhaustion is desirable. When the agency is causing or threatening to cause irreparable injury through clearly illegal action, exhaustion is unlikely to be required, and when a disputed question seems to be within the agency's specialization and the agency can provide satisfactory relief, exhaustion is likely to be required. When a court deems exhaustion desirable, it may say that it lacks jurisdiction to interfere, but when the question is a close one, a court may acknowledge that the result depends more on judicial discretion than on law. The area of predictability is a large one, but the area of doubt—and discretion—is about equally large.
>
> The main reason that judicial discretion rather than law is the basis for most litigated questions about exhaustion is that the factors pulling each way are usually plural, each is usually a variable

so that the question is not its presence or absence but the degree of its strength or weakness, the combinations of degrees of factors pulling one way must be weighed against combinations pulling the other way, and the court is typically limited to deciding on the basis of preliminary impressions.

4 Davis, *supra*, at 414.

For this case, we will apply *Sims*, 521 P.2d 1347 and justify judicial involvement only by appellate review and not through original adjudication. Recognizing the importance of this administrative structure within the status of Wyoming tax law, we agree with the district court. We decline any present invitation to require the district court to conduct a broad analysis of valuation point issues prior to the first review by that constitutionally-established and statutorily-directed agency. The complexities of the Wyoming taxation system provide an adjudicatory challenge that will not be accepted for judicial resolution until administrative agency review and reconciliation on this broad issue can be completed.[4] *Sims*, 521 P.2d 1347.

## IV. STATUTES OF LIMITATION THAT APPLY TO UNPAID SEVERANCE AND AD VALOREM TAXES RESULTING FROM MINERAL PRODUCTION UNDER WYOMING CONSTITUTIONAL AND STATUTORY PROVISIONS

We address this topic because of its immediate and weighty significance to the mineral industry, to the state and county taxation authorities, and certainly in addition to the forthcoming 52nd Wyoming State Legislature, which will now convene in January 1993. It is in regard to our undertaking this subject's present consideration where we reach significant adjudicatory difference with the district court. With the existence of any statute of limita-

---

(1923); *Bunten v. Rock Springs Grazing Ass'n*, 29 Wyo. 461, 215 P. 244 (1923); and *Ricketts v. Crewdson*, 13 Wyo. 284, 79 P. 1042 (1905).

**4.** We do not choose to define the availability of declaratory judgment in every case challenging

assessments, but leave the exercised discretion review particular for this appeal to agree with the district court that we will not require it to accept agency bypass for this major decision which touches much of the essence of Wyoming taxation revenue resources.

tion and the resulting scope of application to be determined as a question of law, we will address this well-briefed subject for a present determination of the status of Wyoming law.

The decision as to which statute of limitation, if any, may be applicable to a particular fact situation—in this case involving the collection of delinquent taxes—is a determination of law. *Hall v. Romero,* 141 Ariz. 120, 685 P.2d 757 (1984); *Pembee Mfg. Corp. v. Cape Fear Const. Co., Inc.,* 313 N.C. 488, 329 S.E.2d 350 (1985); *Smart v. Texas American Bank/Galleria,* 680 S.W.2d 896 (Tex.App.1984); *Kroeger v. Kroeger,* 120 Wis.2d 48, 353 N.W.2d 60 (1984). Only if contested facts exist, or the facts are in question in the evidentiary presentation, does a mixed question of fact and law then result. 54 C.J.S., *Limitations of Actions,* § 301 at 382 (1987); *Reis v. Cox,* 104 Idaho 434, 660 P.2d 46 (1982); *see also Mills v. Garlow,* 768 P.2d 554 (Wyo.1989). Like the normal statutory interpretation questions, we are presented with a decision to be addressed as a matter of law. *Shepperd v. Boettcher & Co., Inc.,* 756 P.2d 182 (Wyo.1988).

Our research of this segment of Wyoming law is developed to follow the Taxpayer's contention by considering any limitation on delinquent tax collection. This approach directs search for any legislative decisions by enacted statutes or authorized agency rules which can provide a time limitation for the delinquent taxpayer to escape from unpaid severance or ad valorem taxes which have been unreported or unpaid for mineral production in prior tax periods.

We start with the analysis of the Taxpayer in its appellate brief:

In its Complaint for declaratory relief, Appellant requested the District Court enter an Order declaring the following rules and regulations and statutory provisions restricted Appellees' taxation activities.

a) *Ch. XXI, Section 14(c)(ii), Rules and Regulations of the Wyoming State Tax Commission (1986)* provides: Taxpayer records should be kept for three calendar years unless otherwise provided by law. Its successor regulation (relating to production year 1989 and subsequent) requires that all records shall be retained for a minimum of five years unless otherwise provided by law. Ch. XXI, Section 14(c)(ii), Rules and Regulations of the Wyoming State Tax Commission (February, 1990).

b) *W.S. Section 39-6-304(o),* provides in part: Audits provided by this article shall commence within five (5) years of the reporting period and taxpayers shall keep accurate books and records of all production subject to taxes imposed by this article and determinations of taxable value as prescribed by W.S. § 39-2-202 for a period of five (5) years and make them available to department examiners for audit purposes. (1988 Wyo.Sess.Laws, Ch. 90 Section[s] 1, 3).

c) *W.S. Section 39-2-403(c),* provides in part: The county assessor may authorize changes in the assessment roll or tax list at any time to correct errors in the name of a person taxed or to enter omitted property and its assessed value. Property omitted from prior years tax lists discovered by the county assessor shall be added to the assessment roll and taxes computed and collected for the period the property was omitted not exceeding five (5) prior years or since the last change in ownership, whichever is less.

d) *W.S. Section 1-3-105(a)(ii)(B) (1988)* provides a general eight (8) year statute of limitations on an action arising upon a liability created by statute other than a forfeiture or penalty.

The counties agree with the Taxpayer in likewise asking for a decision by this court with, of course, the opposite result requested:

Initially, the Counties agree with Appellant that the dismissal of its claim that there is a three, five or eight year statute of limitations limiting the Counties' ability to discovery and collect unpaid ad valorem taxes on mineral produc-

tion was error. Whether any of the claimed statutes of limitations applies is a question of law which should have been decided by the District Court. The Counties assert, however, that this question must be answered in the negative for production in the years at issue in this case.

Stating the substantive disagreement, however, the counties first itemized the statutory limitation concepts outlined in the Taxpayer's appellate brief:

> Appellant claimed that there were four provisions of statute or rules which operated as statutes of limitations precluding both the State and the "County Contract Auditors" from seeking to collect unpaid mineral taxes for production years prior to 1990. First, the three-year record retention requirement imposed by Rules and Regulations of the Wyoming State Tax Commission, Ch. XXI, § 14(c)(ii), (1986) is asserted to be a statute of limitations prohibiting audit and collection of taxes beyond the record retention requirement. Second, Appellant claims that the five-year record retention requirement of the same rule, as amended in 1990, or its corresponding statutory provision, W.S. 39–6–304(o), prohibits the State and Counties from discovering and collecting unpaid taxes. Third, Appellant asserts that the provision regarding omitted property of W.S. 39–2–403(c) establishes a five-year statute of limitations operating against the Counties. Finally, Appellant asserts that the general eight-year statute of limitations contained in W.S. 1–3–105(a)(ii)(B) operates against both the State and the Counties.

For a response to the enumeration, the counties then state: "None of these provisions operate in the manner Appellant asserts."

First, in regard to the rules and regulations, the counties contend:

> However, merely because mineral producers are required to keep records available for State audit does not mean that the Counties cannot look back further than three or five years to determine whether production has been fully reported.

Next, the counties contend that the statutory limitation of Wyo.Stat. 39–6–304(o) (1990), which was the newly enacted statutory limitation on bookkeeping, similarly did not apply:

> On its face, this limitation concerns when State Department of Audit employees may audit the taxpayer's records. It says nothing about the power of the "County Contract Auditors" to compare the reports of the taxpayer submitted to State and Federal agencies for consistency in reporting production. Nor does this statute purport to be a statute of limitations on assessment or collection [of] unpaid ad valorem taxes on mineral production.

Attention was then directed to the omitted property limitation, Wyo.Stat. § 39–2–403(c) (1990), about which the counties conclude that the provision neither constituted a statutory limitation nor had applicability to the county operation since the assessment process was a state function. Finally, the eight year statute of limitation was rejected by argument of its inapplicability because of non-specificity to public instrumentalities by direct citation to this court's recent decision in *Laramie County School Dist. No. One By and Through Brown v. Muir,* 808 P.2d 797 (Wyo.1991).

The State, in addressing the impact of the statute of limitation issue, initiated its perception by citation to *Muir:*

> Should this Court decide to address the substantive issue, it should uphold the State's and counties' position in this matter. Generally, statutes of limitations do not run against the state unless specifically provided by law.

Although asserting that no present need to address this subject might exist, the State then concluded: "In the alternative, this Court should remand this case with instructions to enter summary judgment in favor of the State defendants on the issue of there being no limitations on the Board's ability to review and remedy improper mineral tax assessments."

Consequently, the scope of litigant disagreement moves from the State's posture that no limitation exists to that of the Taxpayer perceiving limitations alternatively provided by:

a. Three or five year record retention requirements developed by the rules and regulations of the tax commission;

b. Wyo.Stat. § 39–6–304(o) provision for record retention;

c. Wyo.Stat. § 39–2–403(c) five year limitation on county assessor's ability to correct errors in the property assessment role; or

d. Wyo.Stat. § 1–3–105(a)(ii)(B) (1988) general eight year statute of limitation on an action arising upon a liability created by statute other than a forfeiture or a penalty.

As a matter of interest, this entire subject of a time limitation to collect unpaid mineral taxes or the specific application of any one of the described provisions listed above has never previously been considered by this court. This is an original review of Wyoming statutory and constitutional provisions regarding the limitation of time for government to collect delinquent and unpaid mineral taxes.

Our analysis is directed to look for some applicable delinquent tax collection time limitation. To save suspense, we find none under Wyoming law which restricts the power of the state and its taxing instrumentalities, the counties, from collecting due and unpaid mineral production taxes. It is concluded that the passage of time will not serve to absolve non-payment of Wyoming ad valorem and severance taxes which, although due for prior periods, went unreported and consequently unpaid. In discussion, each suggested limitation will, however, be sequentially considered.

Before addressing those four individual limitation contentions, it should be recognized that there are two questions for administrative agency decision making. The first addresses quantity, e.g., has only a portion of the total production been reported for either or both severance and ad valorem taxes. Comparison of tax reports to the State Oil and Gas Commission and federal agency required reporting tend to provide some rather specific equivalency comparisons. These quantity reconciliation approaches, which are not actually an audit, come directly into the subject of county contract services programs which provide the Taxpayer's challenge in the third principal aspect of this litigation. This is the quantities question.

In addition to the reconciliation process of quantity, the second quite obvious subject is more likely an audit activity and involves the determination of assessable value. A broad range of computable determinants may be applied for the value assessment upon which tax obligations are then mathematically determined for both ad valorem and severance taxes. This is the valuation question.

Actually, the direct issue presented by this appeal essentially involves valuation as the first issue and quantities as the subject of the third, which is a county contracting program. The second subject, statutes of limitation, obviously addressed both quantities and value, but with a different character, since quantity valuation may be much simpler than audit functions emplaced in any true sale price and cost computation which is intrinsic to value determination long recognized in our case law, e.g., *Amax Coal Co.*, 819 P.2d 825; *Appeal of Monolith Portland Midwest Co., Inc.*, 574 P.2d 757 (Wyo.1978).

A. *Adjudicatory Agency Rule Provision: Time Limitation for Record Retention.*

■ Administrative rules put into effect by the taxation authority, the Department of Revenue, provide for a minimum time for the producer, e.g., Taxpayer—to retain business records relating to either quantity or value. This is Rules and Regulations of the Wyoming State Tax Commission ch. XXI, § 14(c)(ii) (1986) earlier quoted by the Taxpayer. It requires that all records shall be retained for a minimum of five years unless otherwise provided by law. This is the 1990 provision which extends the time from the earlier requirement of three years provided in the 1986 rules.

The argument is made from the record retention provisions of the rule that the department had established a limitation period for pursuing uncollected taxes. We do not agree for several reasons. In first instance, no citation is provided. Nor do we find authority otherwise legislatively delegated by statute for any agency, and particularly the tax collecting agencies, to establish an administrative rule for a time limitation period developed by an administrative practice which would insulate or extinguish the taxpayer liability after passage of that stated time. *Walgreen Co. v. State Bd. of Equalization,* 62 Wyo. 288, 166 P.2d 960 (1946) is directly to the contrary.

It is obvious beyond question that a specific delegation of authority by statutory provision, if even then valid, would be required to permit the agency to promulgate a limitation of liability provision for taxation obligation. An administrative agency is limited in authority to powers legislatively delegated. *Hupp v. Employment Sec. Com'n. of Wyoming,* 715 P.2d 223 (Wyo.1986); *Continental Pipe Line Co. v. Belle Fourche Pipeline Co.,* 372 F.Supp. 1333 (D.Wyo.1974). "Administrative agencies are creatures of statute and their power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim." 1 Am.Jur.2d *Administrative Law* § 70, at 866 (1962) (footnotes omitted). Neither the Wyoming Constitution nor the statutes authorize agency tax forgiveness determinable by age of delinquency and the passage of time without reporting or payment.[5] An equivalent and well-reasoned view of the general status of American law on administrative agency litigation of authority is provided by *Swift & Co. v. State Tax Com'n,* 105 Ariz. 226, 462

P.2d 775 (1969), *overruled on other grounds sub nom. Pittsburgh Midway Coal Min. Co. v. Arizona Dept. of Revenue,* 161 Ariz. 135, 776 P.2d 1061 (1989). *See also Hernandez v. Frohmiller,* 68 Ariz. 242, 204 P.2d 854 (1949). The non-acquiescence and limited authority concepts discussed in detail in *Rocky Mountain Oil and Gas Ass'n,* 749 P.2d 221 are completely compatible with this perspective and analysis. *Cf. Cochise County v. Kirschner,* 830 P.2d 470 (Ariz.App.1992) (separate state entity perspective).

Any other conclusion would introduce additional problems. A portion of the severance tax is constitutionally directed to a permanent fund account to be saved in perpetuity for the citizens of the state. Wyo. Const. art. 15, § 19. What is inviolate from expenditure surely cannot be considered administratively available to be forgiven if undisclosed and unpaid for a limited period. Another constitutional problem would be presented by Wyo. Const. art. 15, § 3 which creates the ad valorem tax determinable in amount by production. Those taxes belong to the counties, cities, school districts and special taxation agencies. Clearly, the legislature has not statutorily delegated authority to the state executive department to forgive payment of taxation revenues due to these local units of government. The required defaulting taxpayer moratorium or the forgiveness authorization statute for rule adaptation by the tax collection agencies do not exist.

Consequently, we follow the arguments of the State and counties without defining our basis for decision based on constitutional law. Any agency rules which permit or require a time limit for retention of records and bookkeeping provisions cannot create a broad tax forgiveness

---

5. Wyo. Const. art. 3, § 40 provides:
 **Debts to state or municipal corporation cannot be released unless otherwise prescribed by legislature.**
 No obligation or liability of any person, association or corporation held or owned by the state or any municipal corporation therein shall ever be exchanged, transferred, remitted, released, postponed or in any way diminished except as may be prescribed by the

legislature. The liability or obligation shall not be extinguished except by payment into the proper treasury or as may otherwise be prescribed by the legislature in cases where the obligation or liability is not collectible. *See MacDougall v. Board of Land Com'rs of Wyoming,* 48 Wyo. 493, 49 P.2d 663 (1935); and *cf. Gonzales v. Personal Collection Service,* 494 P.2d 201 (Wyo.1972).

time limitation. Furthermore, if the regulations were to be given this interpretation, even if specifically indicated to be the intent, we would be required to deny effectiveness. Actually, we do not find that specific intent to be discernible from the terms of regulations sufficient to create an agency intended purpose to create tax moratoriums.

B. *Wyo.Stat. § 39-6-304(o) and (p): Time Limitations for Record Retention and Auditing by Statute.*

■ Wyo.Stat. § 39-6-304(o) and (p) provide:

(o) Audits provided by this article shall commence within five (5) years of the reporting period and taxpayers shall keep accurate books and records of all production subject to taxes imposed by this article and determinations of taxable value as prescribed by W.S. 39-2-202 for a period of five (5) years and make them available to department examiners for audit purposes. If the examination discloses evidence of gross negligence by the taxpayer in reporting and paying the tax, the department may examine all pertinent records for any reporting period without regard to the limitations set forth in subsections (o) and (p) of this section.

(p) In order to examine relevant books or records of a taxpayer subject to a tax imposed by this article or to secure any information related to enforcement of this article, authorized representatives of the department may at any time during normal business hours enter premises of a taxpayer liable for a tax imposed by this article or the premises of any third party having information regarding that taxpayer's liability. Prior to entering the premises of a taxpayer or third party, the department shall provide fourteen (14) days written notice to the taxpayer and third party. Such examinations shall be completed and the written results thereof provided to the taxpayer by the end of the third calendar year following the calendar year in which the audit was commenced.

Initially, it is apparent that these sections apply only to severance taxes and would not create any applicable limitation period to collect unpaid ad valorem taxes based either on nonreporting quantity or erroneous computation of value. The concepts presented by this argument are identical with the subject addressed in the prior section of this opinion; except here, rather than delegated authority, this argument considers statutorily created limitations imposed on the agency.

We apply the clear language of these statutes to only establish an audit period limitation subject to the gross negligence extension exception. We find *Walgreen,* 62 Wyo. 288, 166 P.2d 960 again dispositive in lack of discernible legislative intent to go beyond the explicit statutory language to release the obligation to the public instrumentality as a debt due to the government or to provide a tax moratorium.[6]

It is recognized, as the State argues, that Wyo.Stat. § 39-6-304, as rewritten by 1988 Wyo.Sess.Laws ch. 90, § 3, would not be applied to the tax years here in issue. The statutes, by virtue of the prospective application provided by that legislation, Wyo.

---

**6.** We can consequently avoid constitutional questions otherwise presented by Wyo. Const. art. 3, § 40 and art. 3, § 27 which, as limitations on special legislation, specifically include extending the time for the collection of tax or relinquishing or extinguishing, in whole or in part, the indebtedness, culpability or obligation of any corporation or person to the state or any municipal corporation therein. These special provisions are supplemented by the final sentence of the section which provides: "In all other cases where a general law can be made applicable no special law shall be enacted." Wyo. Const. art. 3, § 27. Notably, Wyo. Const. art. 3, § 40 cannot be ignored either.

Also implicated in consideration of any special entity taxpayer statute of limitation is Wyo. Const. art. 1, § 34: **"Uniform operation of general law.** All laws of a general nature shall have a uniform operation." Furthermore, in addition to the uniformity of taxation requirements provided in Wyo. Const. art. 15, any forgiveness by statute or limitation might be subject to Wyo. Const. art. 15, § 14: **"Surrender of taxing power prohibited.** The power of taxation shall never be surrendered or suspended by any grant or contract to which the state or any county or other municipal corporation shall be a party."

Stat. §§ 39–6–301 through 39–6–307 as they were in effect prior to January 1, 1989, apply only to production in the calendar year 1988. Clearly, a prospective application was intended for the new statute. No tax obligation insulation from liability is provided to this Taxpayer by Wyo.Stat. § 39–6–304(*o*) and (p).

### C. *Wyo.Stat. § 39–2–403(c); County Assessor Tax List Change Statute.*

■ This section pertains to the ad valorem tax and cannot be considered to be a limitation on the collection of unreported taxes derived from severance statutes, Wyo.Stat. §§ 39–6–301 through 39–6–309. With regard to the duties and responsibilities of the county assessor, Wyo.Stat. § 39–2–403(c) provides:

> The county assessor may authorize changes in the assessment roll or tax list at any time to correct errors in the name of the person taxed or to enter omitted property and its assessed value. Property omitted from prior year tax lists discovered by the county assessor shall be added to the assessment roll and taxes computed and collected for the period the property was omitted not exceeding five (5) prior years or since the last change in ownership, whichever is less.

■ The counties argue with considerable persuasion that this statute, which can be traced back to 1977 Wyo.Sess.Laws ch. 45, does not apply to mineral taxation which developed from state assessment. Additionally, they contend that tax levy and collection provisions by providing a five year retroactive limitation address the same property in its taxation within the five year period to only limit the number of years for which unpaid taxes can be charged against that item of property. The difference, of course, is that both the ad valorem and severance taxes are a one time only tax which are determinable and payable as a result of production and have no applicability to multi-year omission for the same property.

We concur in the contention made by the counties that no legislative intent existed to apply the five year retroactive preclusion to the one time taxing status of the mineral extractive assets of the state. We will require more specificity from the legislature before finding Wyo.Stat. § 39–2–403(c) was intended to create a tax forgiveness exemption for unpaid ad valorem mineral taxes due to local units of government.[7]

### D. *Wyo.Stat. § 1–3–105(a)(ii)(B); General Statute of Limitation.*

■ The Taxpayer would also have this court find that a time limitation for tax collection was provided by the general statute of limitation code through Wyo.Stat. § 1–3–105(a)(ii)(B), which provides:

> (a) Civil actions other than for the recovery of real property can only be brought within the following periods after the cause of action accrues:
>
> \* \* \* \* \* \*
>
> (ii) Within eight (8) years, an action:
>
> \* \* \* \* \* \*
>
> (B) Upon a liability created by statute other than a forfeiture or penalty[.]

This contention, which comes with the argument that some general statute of limitation can be applied, has been decisively resolved by the recent decision of this court

---

7. The most extended debate of any subject during the Wyoming Constitutional Convention, subject perhaps only to the desired independence of the Wyoming Supreme Court, considered fairness, sufficiency and equivalency for taxation of mineral productions, then principally only coal. The ad valorem tax or full value tax on production was a compromise reached in close voting by the delegates. That compromise constituted what we now have—a full tax for the unproduced mineral estate computed and payable upon production as a one time only incident.

**Taxation of mines and mining claims.**

All mines and mining claims from which gold, silver and other precious metals, soda, saline, coal, mineral oil or other valuable deposit, is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, on the gross product thereof, as may be prescribed by law; provided, that the product of all mines shall be taxed in proportion of the value thereof. Wyo. Const. art. 15, § 3.

in *Muir*, 808 P.2d 797. Certainly, if statutes of limitation do not apply to school construction workmanship, we will not extend the penalty and forfeiture limitation of the cited statute to mineral taxation. If the tax is uncollectible at the one time taxable, it will be lost from this state forever whether as a percentage fund accretion or current operational revenue for education, law enforcement and general government. *Muir*, 808 P.2d 797 is clearly determinative.[8]

We concur with the argument presented by the counties and the tax authority of the State that there is no present statute of limitation or applicable time limitation which limits the right of either the state of Wyoming or the separate counties to collect delinquent and unpaid severance and ad valorem mineral taxes due and payable under either the ad valorem county levy or mine production tax provided by the Wyoming Constitution and Chapters 2 and 6 of Title 39, Wyo.Stat.1977.

## V. COUNTY CONTINGENT FEE "AUDITOR" CONTRACTS

There is a syllogism that defies realism that comes affixed to this subject. It provides a conclusion without the recitation of the initial premise as a question of why a taxpayer should object to a cross check of public records if accurate reporting and proper tax payments have occurred. Alternatively, the topic invites consideration about what the county might be doing to collect unpaid taxes if apparently the state agencies are not accomplishing the desired result.

In present time, and particularly since the reduction in expenditure for the mineral production auditing program, county governments have searched for ways to increase the accuracy of quantity reporting of mineral tax assessments payable as their revenues through the ad valorem tax.[9] What the county governments in Wyoming achieved through this program of using experts to examine public records for quantity discrepancies was a means to be assured that the required revenue contribution from each barrel of oil, each MCF of gas and each ton of solid mineral was realized from the ad valorem mineral taxation system. What had been generally an honor system was superseded, or at least surveilled, by an effective supervision of quantity reporting for tax assessment and collection. State Auditor Griffith, if we judicially notice news accounts of the period, had effectively demonstrated that unre-

---

8. Politicians and political philosophers have pondered the saga of Wyoming severance taxes in considerable detail. *See, e.g.,* T.A. Larson, *History of Wyoming*, at 433–44, 457, 511–13, 514, 527, 528 and 533 (1965). Although after many decades of effort, the first severance tax was passed in 1969, 1969 Wyo.Sess.Laws ch. 193. The real father of the modern severance taxation system for this state was Governor Stanley K. Hathaway, under whose leadership the state was led to the constitutional amendment that created the permanent trust fund. Wyo. Const. art. 15, § 19.

Not so fully documented in research or comment is the historical status of the ad valorem mineral tax underpayment. The only hard evidence in historical perspective came during the tenure of James B. Griffith as State Auditor who, during his terms, 1976 to 1987, embarked on an active program to collect unpaid state mineral royalties. As a result, tens of millions of dollars were collected. Those accomplishments also directly impacted accuracy evaluation of severance and ad valorem tax collections.

From the time of *MacDougall,* 48 Wyo. 493, 49 P.2d 663 (or since statehood) until the audit activities of State Auditor Griffith, it can be and has been realistically estimated that the state missed in royalty and mineral tax collections perhaps at least a billion dollars, then involving in reality, real money. Hot oil sometimes escaping royalty obligation, but as often escaping tax assessment, was not an unnoticed oil patch societal "indignity." For reasons not clarified in the practical operation of government and its efficient collection of revenues, the 1992 legislature substantially reduced the staff originally developed by State Auditor Griffith by very heavy personnel reductions of experts in auditing the accuracy of mineral royalty collections. 1992 Wyo.Sess.Laws ch. 93.

9. Since public school districts get the large portion of these taxes, their self interest should likewise be most explicitly manifested. Perhaps that lack of involvement is first occasioned by the primary responsibility of the county authorities and not a responsibility of the benefiting school district to collect taxes and, secondly, from the assumption that what is not collected locally will be replaced by state funding.

ported and consequently uncollected mineral royalty revenues did exist in large dollar amounts.

Counties then came to employ assistants for tax collection from certain contract representatives; not to do audits, but rather to compare details written into the different governmentally required reports. The contract examiners were then compensated on a stated time fee basis and *a contingency percentage based on success.* This assistance was not based on invasion of the office of the producers as taxpayers. To the contrary, these "bounty hunters" just compared records in state offices, principally from the reports made to the Wyoming State Oil and Gas Commission and, to some degree, federal agencies. From a tax collection perspective, this was a search for hot oil and missing natural gas.[10]

The method of the program is described in the record by an affidavit of the director of the mineral tax division of the Department of Revenue:

25. The "Contract Auditors" gather information from records on file with the Division and other agencies of State and Federal government. The "Contract Auditors" review information relative to reported sales of minerals filed with the Division and compare that information to public records of production and sales filed with other agencies, notably the Wyoming Oil and Gas Conservation Commission. If the reports demonstrate a discrepancy between reported information to the various governmental agencies, the "Contract Auditors" notify the Division, on behalf of the County which has employed them.

26. The procedure for handling this information within the Mineral Tax Division is as follows:

a) The information is first reviewed within the Mineral Tax Division in order to determine if [there are] legitimate questions regarding the validity of the reports made for taxation purposes. If the information does not raise such questions, no action is taken with respect to the reporting producer.

b) If the information provided is deemed by the Mineral Tax Division to merit further inquiry, the taxpayer is notified in writing of the information provided to the Division by the "Contract Auditors." The taxpayer is asked to review the reported discrepancy based upon its own record review, and either file an amended tax report (Form ATD–4), or submit an explanation of the discrepancy to the Mineral Tax Division within a specified period of time, usually twenty (20) days, or such extended period as the taxpayer may reasonably request.

c) If the taxpayer satisfactorily explains the discrepancy reported by the "Contract Auditors," the matter is at an end.

d) If the taxpayer fails to adequately explain the discrepancy, or submits amended tax reports, the Division issues an assessment notice for additional severance taxes due. This notice also serves as a notice of additional value for ad valorem tax purposes.

e) If the taxpayer disagrees with the notice of assessment, it may protest to the Department of Revenue within thirty (30) days.

f) If protest is made, the Department may reconsider the assessment and grant an informal hearing, if requested by the

---

**10.** In briefing, the Taxpayer complains that one county contract auditor received compensation on an hourly rate of $266,015 and a contingent fee in addition of $387,461. The program must have been singularly successful in the perception of the counties or they would have discontinued the activity. The program must have certainly been effective in the collection or the Taxpayer would not feel sufficiently threatened to seek redress by an injunctive lawsuit. The counties state in briefing, and as is likewise defined in the record, that this contingent fee is

based on a a 5% bonus for taxes collected and that one such firm in thirty-nine months led to the collection of nearly eight million dollars in ad valorem taxes (this would not include unpaid severance tax). Mathematically computed, if the Taxpayer accurately stated the contingent fee for the examiner to net $387,461 in contingent fees, about $7.7 million in additional ad valorem taxes and perhaps 50% of that amount in severance taxes, for a total of approximately twelve million dollars, would have been realized as additional public government revenues.

taxpayer. After the reconsideration the Department issues its final determination. If no protest is filed by the taxpayer, the assessment notice becomes final after the lapse of thirty (30) days.

g) The final determination by the Department is subject to appeal by the taxpayer to the State Board of Equalization.

27. All information provided to the Mineral Tax Division by the "County Auditors," including any such information relative to the Union Pacific Resources Company, has been handled in the fashion described above. The "Contract Auditors" do not assess any increased valuation for any tax purpose. Every taxpayer has adequate opportunity to explain any discrepancy in reported production which is found by a "Contract Auditor," and to protest and appeal an assessment, if any, which may result from a discrepancy found by the "Contract Auditors."

The counties describe the activity from their perspective:

The service that these firms provide is not a tax audit as that term is commonly understood. They have no access to the internal records of the producers. * * * Rather, the firms make a comparison of the tax returns filed by the producers with public information filed with the State Oil and Gas Conservation Commission and that available from federal agencies. * * *

When the firms discover a discrepancy between production or sales reported to the Department of Revenue, and that reported to other governmental agencies, they prepare a report of their findings, on behalf of the client county, to the Department of Revenue and Taxation, Mineral Tax Division. * * * Further, the firms request that the Mineral Tax Division investigate the discrepant reports. * * *

The Mineral Tax Division reviews the reports, and if it finds that a discrepancy does exist, forwards the information to the producer with a request for explanation of the apparent discrepancy. If the producer satisfactorily explains the discrepancy, the matter is at an end. If, on the other hand, the producer cannot or refuses to explain the discrepancy, an additional assessment is made. The producer is then given opportunity for normal administrative review of the additional assessment. * * *

The firms charge an hourly fee for their work, typically to a specified maximum, plus a bonus of 5% of any additional taxes actually collected by the Counties as a result of their work. * * * During the 39–month period from September 1988 to November 1991, one such firm's work has led to the collection of nearly $8 million in unpaid ad valorem taxes. * * * The record does not reflect how many millions in previously unpaid severance taxes the firms' work has generated.

The firms do not assess the producers, but merely request that discrepancies between reports be explained by the producers to the Mineral Tax Division. The firms do not know which of the reviewed reports is accurate, if any of them are, since all are based upon producer provided information.[11]

11. As an illustration of the contract "auditor" data development for the Bruff Field 041–20213 discrepancy:

| Year | Reported Wyoming Oil & Gas Commission | Reported for Property Tax Form ATD–4 | Discrepancy |
|------|---------------------------------------|--------------------------------------|-------------|
| 1979 | 25,961 MCF | 0 | 25,961 |
| 1980 | 877 bbl | 1,259 | (382) |
| 1980 | 395,878 MCF | 232,402 | 163,476 |
| 1981 | 248,808 MCF | 185,069 | 63,739 |
| 1982 | 194,211 MCF | 156,326 | 37,885 |
| 1983 | 237 bbl | 916 | (679) |
| 1983 | 156,966 MCF | 131,392 | 25,574 |
| 1984 | 134 bbl | 2,528 | (2,394) |
| 1984 | 84,121 MCF | .114,800 | (30,679) |
| 1985 | 175,962 MCF | 214,811 | (38,849) |

As a result of these activities, the State, on March 13, 1991, sent a delinquency assessment notice addressed to Champlin Petroleum Corporation (a business entity of Taxpayer), which stated:

The Wyoming Department of Revenue has reviewed oil and gas production and sales from wells operated by Champlin Petroleum Company in the Big Dry Creek, Bruff, Chapman Draw and Dutton Creek fields located in Carbon and Uinta Counties, Wyoming for production years 1979 through 1988. Our letters dated October 12 and October 16, 1990 requested that you review your records and submit an explanation for the apparent discrepancies as identified in the aforementioned letters. Union Pacific's letter dated November 9, 1990 requested 90 days to respond to the findings, which we granted. The extension deadline of February 9, 1991 has expired and to this date, we have yet to receive a response from Union Pacific. Therefore, this letter is an assessment notice, based on the best information available, for severance tax underpayments, including interest and penalty determinations, resulting from the above mentioned findings and also serves as notice of assessment of additional taxable value for ad valorem tax purposes.

Additional severance tax, penalty and interest per attached Schedule 1 is as follows:

| | |
|---|---|
| Additional Severance Tax | $ 97,419 |
| Interest at 18% Per Annum through 4–12–91 | $234,924 |
| Penalty at 25% | $ 40,239 |
| TOTAL DUE | $372,582 |

The total increase in ad valorem taxable value is $2,007,075 and is detailed in Schedule 2.

Following the departure of State Auditor Griffith from public service, a state government reorganization occurred involving the entirety of the Wyoming taxation assessment and collection system. With that reorganization, the Wyoming state taxation function of the Department of Revenue and Taxation was divided with the creation of the State Board of Equalization. That Board, consisting of three appointees by the governor, was separated out into a semi-judicial hearing and appeal agency. The administrative tax collection activities were placed in the Department of Revenue as a position headed by a gubernatorial cabinet appointee as director. Consequently, the administrative function previously exercised by the State Board of Equalization/Tax Commission was transferred to the new agency with a single top administrator.

At the same time, the mineral royalty audit function, which had been developed into high efficiency during the times of management by State Auditor Griffith, was transferred from that agency to the newly created audit division, again headed by a cabinet level appointee. The argument of counsel and the detailed record provided in this appeal lack complete meaning without understanding that, for reasons of choice by the Taxpayer, the Audit Division of state government was not introduced to be a player in this litigation, although the audit division is presently undertaking an audit of the same production which is the subject matter of the complaint of the Taxpayer regarding the contract auditor's reporting of discrepancies. Use or non-use of the county representative workup by the Audit Division is unclear, if existent, since the direction of activity goes from those companies as representatives of the county directly to the Department of Revenue.

| | | | |
|---|---|---|---|
| 1986 | 5,478 MCF | 69,353 | (14,573) |

Note Amoco Production Reported:
TIK [Taken In Kind] Sales 041–20213 13,817 MCF

| | | | |
|---|---|---|---|
| 1987 | None | | |
| 1988 | 91,180 MCF | 92,530 | (1,350) |

Amoco TIK 15,985 MCF

Obviously, any competent audit activity would evolve itself into concepts of value as well as the more easily determinable quantities question.

It is clearly demonstrated, however, that the third part of this litigation is directed by the Taxpayer to elimination of the fourth player—county government—from any delinquency tax research capability and particularly to the use of the "bounty hunters" who have incurred considerable success. There exists then, under current state taxation methodology, three state players and the counties: the state Department of Revenue with the collection and taxation supervision responsibilities; the State Board of Equalization with a semi-judicial appeal and supervisory responsibility; and the Mineral Audit Division of the Department of Audit with a delinquency audit responsibility; and finally, county governments which have a direct pecuniary interest in the collection of the ad valorem tax. Value is established by the Department of Revenue subject to appeal to the State Board of Equalization with the function of the counties regarding ad valorem tax only limited to a quantities validation program for collection. No particular level of cooperation between the state Audit Division and the county search efforts is demonstrable and the cooperation between the Department of Revenue and the Audit Division is not directly addressed.

The principal witness in deposition, Randall L. Fetterolf, had been employed in mineral audit by the State Auditor's office. After five years in that activity, 1981 to 1986, he left state government to organize Wyoming Royalties for the purpose of contracting to conduct mineral production and reporting reviews for both private land owners and public instrumentalities. That function, pursued in agreement with various county governments, was clearly defined. The company took oil and gas production tax reports filed with the Department of Revenue, previously the Department of Revenue and Taxation, and made quantity comparisons with other material which generally included reports filed with the Wyoming Oil and Gas Commission and such federal records as might be obtained.

Royalty tax payments on school section lands where the state owned the minerals might also be available for comparison.

When apparent discrepancies were developed for the same well or field, favorable or unfavorable, those compilations were submitted to the Department of Revenue on behalf of the counties for consideration of the existence of the ad valorem tax delinquencies. The state agency, which is charged with consideration of the data, provided review to some degree or another and then had the option to continue some collection effort by making a request to the taxpayer to provide an explanation of any established or at least indicated discrepancies.

■■■ In no sense did the activity of the counties' contract representatives actually consist of an audit. This is particularly true because it was not developed from original records which would have been log reports/field run reports made by field pumpers or comparable data from tank battery gauges as the source of initial production. These records would then be compared with sales receipts or intake reports from pipelines as the document of original entry for resale. It was not an audit because the contractor had no access to those original records.

Into the esoteric field of mineral production reporting, this record also reveals existence of exchange agreements TIK (taken in kind), so that the producer for a particular field may exchange production for that received from a far away field, and consequently another entity may actually market the Wyoming production. These complex and diverse methods of accounting and sale are not involved in this litigation as audit details since the function provided here by the "bounty hunter" is to mathematically compare what the taxpayer has reported for ad valorem taxation with its identically required volume reports of the same production to other state and federal agencies. These contractor review companies similarly perform the same kinds of services for ranchers with large royalty acreage who might question the accuracy of production reports made for their oil and gas interests.

How the state department necessarily utilized the county contractor compiled information in regard to the coordinate severance tax collection activities is not completely clarified in briefing or argument. The quoted assessment notice does reveal that the information was equally applied to both severance as well as ad valorem taxes.

The substance of this third segment of this Taxpayer's litigation addresses whether county government, in an effort to protect and augment its revenues, can employ contractors with expertise and knowledge in oil production accounting to make the quantity comparisons. Overtly, in briefing and trial preparation, as well as depositions, the heaviest attack was directed at the income generated for the contractor including the contingent fee which funds otherwise would have been retained by the county if the tax had been properly paid or if the state had first found these discrepancies by record cross-referencing or, more completely, by comprehensive audits.

 Foundational and constitutional attacks on this characterized "bounty hunter" contingent fee contracting service are logically and thoughtfully presented by the Taxpayer and come in a broad public policy perspective of several aspects. Those include: (a) violation of the constitutional balance of power of the checks and balances system in general; (b) the contingent fee creates an improper financial stake in audit findings [12]—as such, the "agreement" violates public policy because it undermines and threatens the Taxpayer's right to a fair and impartial tax assessment; and (c) lack of statutory authority for county government to undertake these activities, e.g., existence of preemption by state agencies.

All pathways regarding the validity of this kind of activity for tax record review services lead back to the 1935 case of *MacDougall v. Board of Land Com'rs of Wyoming*, 48 Wyo. 493, 49 P.2d 663 (1935). At that time, Wyoming state government and the legislature became concerned about the adequacy of royalty reporting on some state school sections which were very heavy oil producing properties. The contract for auditing companies included:

"FIRST. The Parties of the Second Part hereby agree to proceed diligently to check operations now existing and heretofore used in determining the quantity and quality of oil, gas and/or gasoline produced from the said real properties and to audit such producing records as may be deemed advisable by the Parties of the Second Part, in order to determine as soon as possible whether or not the persons or companies that have produced or purchased oil, gas and/or gasoline from said above described real property have accounted for lessor's royalties for all of said production, and as to whether or not said lessees have damaged the Party of the First Part in carrying on their operations under the leases hereinbefore referred to, and to render to the Party of the First Part a detailed report as to such findings, and render their opinion as to whether a cause of action on the part of the Party of the First Part exists against such lessee or lessees, for damages by reasons of failure or neglect on the part of any lessee or lessees to properly carry out and perform the terms of its or their lease or leases covering such oil and gas properties.

"SECOND. The Party of the First Part hereby agrees to pay a contingent fee to the Parties of the Second Part for their said services as follows:

'25% of the first $1,000,000.00 which may be recovered on account of any such claims, damages, demands or causes of action.'

**12.** The Taxpayer defines the challenged contract service activities to be audits while the independent contractor service provider defines the activities to be a quantities comparison. Overtly, it is not an audit to be made from original taxpayer records, but is a mathematical analysis and compilation. As such, if a discrepancy is found, some report has to be in error. With a discrepancy in quantity reporting existing at one place or another, the function performed in the mathematical comparison of related reports does require expertise and knowledge of both oil field practices and accounting standards, as well as the ability to compile data through addition and subtraction.

'16.66% of any and all recoveries had of any sums in excess of $1,000,-000.00.'

"The term recoveries includes all sums or things of value which may be received, had or recovered either as a result of settlement of claims, damages, demands or causes of action against any lessee or lessees or as a result of litigation against any lessee or lessees.

"THIRD. The Party of the First Part shall and it hereby does give to the Parties of the Second Part such power of attorney or authority as they shall require in rendering their service as aforesaid, and in particular, said Party of the First Part shall and it hereby does give to the Parties of the Second Part full and complete authority and makes them its agents and does hereby constitute them its attorney-in-fact with authority to demand, inspect, take copies of and investigate all books, records and methods now or heretofore or hereafter used by said lessee, and to take samples."

*MacDougall*, 48 Wyo. at 498–99, 49 P.2d at 664–65.

The Wyoming Supreme Court did not view the effort to collect these constitutionally dedicated trust fund revenues with favor. The court authenticated its concern by stating:

The control of an investigation such as is contemplated in the contract in question, involving as it does the authority to demand and inspect books and records, and thus harass citizens or residents of this state, is of the same nature as the control of litigation and must be judged by the same rule. While the investigation itself, doubtless, is a ministerial act, the fact whether it shall be made or how long it shall continue involves discretion, which, as already stated, cannot be delegated, and the provision, accordingly, delegating at least part of that right to Hanna & Morton, is clearly void. Whether or not the whole contract is thereby invalidated is a more difficult question and need not be decided herein.

\* \* \* In order that a more comprehensive view of the question in hand may be had, it may be well to discuss other rea-sonably well settled principles. There was no express constitutional or statutory authority for the state land board to enter into the contract in question. If such authority existed, it must be an implied one. The law is well settled that public officers have and can exercise only such powers as are conferred on them by law.

*Id.* at 504, 49 P.2d at 667.

As a consequence, this court found that duties of elected officials had been unconstitutionally delegated, that contracts justified other state officials to neglect their duties, and the contingency fee was illegal. In conclusion, it was stated:

The contract in the case at bar may be of great benefit to the state. But that alone cannot be the controlling fact herein. Other contracts, entered into in the future, might be the reverse. All the law can do is to operate by general rules, which, in the long run, will be best for the interests of the state, and no rule will subserve that purpose which discourages diligence and honesty in public officials. It may be argued that public officials are not required to do anything beyond making all reasonable efforts to perform their duty, and that after they have done so, occasions may still arise when an expert might be employed to the advantage of the state, and without in the least bringing about the evils mentioned. And that, doubtless, is true. And if occasion of that kind arises, and it is clear, they may, perhaps, as held in California, employ such expert, provided that they do not attempt to fix the compensation. In such case, when their acts must be approved by the Legislature, the evils above mentioned would at least be minimized, or entirely overcome.

*Id.* at 510–11, 49 P.2d at 669.

*MacDougall* unfortunately introduced into state revenue and income collection processes decades of benign neglect of collection activities by conceptualization that these services should be founded within good faith and trust. We do not choose to reconstruct that edifice of pervasive neglect. Accuracy in reporting and payment of both statutory and constitutionally di-

rected revenues and resources is justified, accuracy can be required, and accuracy can be delineated in state revenue collection processes. Consequently, we completely concur with the decision stated by the district court in this action:

> Plaintiff also contends the contingent fee contracts between the counties and the investigators are in violation of the public policy of the state. Declaration of public policy is a matter for the legislature not the courts. No matter how odious it may be to the undersigned and to the Plaintiff, contingent fee contracts for tax investigators are not clearly prohibited by the Wyoming Constitution or Statutes. Furthermore, there has not been a clear expression of policy against such contracts enunciated by the legislature. Finally, Plaintiff contends that exclusive power to audit rests with the Wyoming Department of Audit. While this may be true with respect to audits, there is no clear legislative prohibition against Wyoming counties hiring their own tax investigators. Obviously, these so-called county auditors cannot exercise the powers granted by the legislature to the Wyoming Department of Audit; but the Court has been unable to find, and the Plaintiff has not shown the Court, any law prohibiting county commissioners from hiring such mercenaries.

Clearly, the Taxpayer presents an issue here that was not considered in *MacDougall* by additionally questioning *county government* usage of these contract services. We will first look at the level of authority which would permit or deny county government access to the validation services and then look at the question of the method of compensation as a differentiated topic.[13] County government has a clearly assigned responsibility in the intrinsic structure of Wyoming taxation to assess and collect ad valorem taxes. We would judicially notice that during the past decade, the state of Wyoming has spent tens of millions of dollars in assessment activities through contract services to upgrade,

improve and equalize county assessment processes, and that the implementation of the equal and fair concept has not yet been fully achieved. State statutory justification is found in directions and mandates to the State Board of Equalization and in the appropriative process of the monies which has employed the contract assessing services. We find in the nature of Wyoming local government county power to do what the statute directs—assess and collect—and, consequently, the activity is not preempted or superseded by state functions.

■■■ The particular objection attacks the contingent fee compilation. Whatever philosophical or operational validity *MacDougall* may now have, it is clear that the contingent fee preclusion was distinguished and then extinguished in two more cases. *Bourne v. Cole*, 53 Wyo. 31, 77 P.2d 617 (1938) and *Gonzales v. Personal Collection Service*, 494 P.2d 201 (Wyo.1972). In *Bourne*, this court approved specialized legislation permitting the Attorney General to employ special assistants in a contingent fee compensatory fashion to seek out unpaid school and state royalties. This was the same approach previously rejected in *MacDougall* and now employed in *Bourne* with the differentiating factors of a specific statute and primary responsibility now vested in the Attorney General's office rather than the administrative agency. Statutory authority for full audit and litigation pursuit was given under the supervision of the Attorney General's office. This court recognized, with a true and certain logic, that the continued decrease of state revenues when collection was not otherwise enforced was not actual diminution:

> The 25 per cent paid to Cole will diminish the fund at most theoretically. In actuality, a wholly new fund, to the extent of the remainder, may come into existence. Such a possible fund cannot be treated in the same manner as a fund the existence of which is known.

*Bourne*, 53 Wyo. at 40, 77 P.2d at 620. Essentially, this is the logic that what you

---

**13.** Clearly, counties as well as the state for an undefined period of time have employed archi-

tects on a percentage fee basis.

are not receiving you cannot diminish until somebody expends the effort to collect.

This court has recognized a similarity to the settlement of compromise claims. *State v. Young,* 44 Wyo. 6, 7 P.2d 216 (1932). Consequently, in the case, the contingent fee collection process was approved as it was again decisively authenticated in *Gonzales,* 494 P.2d 201, where a contingent fee collection agency was employed by the public hospital to recover unpaid medical charges. In *Gonzales,* the contingent fee was approved to become today a way of life in this field by following *Bourne* and distinguishing *MacDougall.* The court stated that:

> [*Bourne*] further notes that if the usual or customary means or agencies have been found inadequate the legislature in that case has the power to employ special means or agencies for that purpose. This is certainly illustrative that there is no constitutional ban forbidding contingent fee arrangement contracts as such if the statute is sufficient. It also suggests to us that if the hospital does not have sufficient means for collection it may rely upon a contingent fee arrangement without constitutional violation.

*Gonzales,* 494 P.2d at 204–05.

We find no limiting factor in statute or the constitution which precludes the activity of the county as the tax collection agency for ad valorem taxes from utilizing contract services employed in this case to provide a reasonable means to reach a designated public purpose. Contingent fee compensatory arrangements, if reasonable and realistic, are not, under present Wyoming case law, in violation of public policy. *Gonzales,* 494 P.2d 201; *Bourne,* 53 Wyo. 31, 77 P.2d 617.

## VI. CONCLUSION

We find justification for the exercised discretion of the district court to yield on the point of valuation issue to an exhaustion of administrative remedies request by the state taxation agencies. The question was properly raised in this litigation for determination that no statute of limitation exists limiting collection of unpaid severance and ad valorem taxes due upon mineral production. Finally, this court agrees with the district court in reasoning that the contract services program of the county governments to search for unpaid mineral taxes is neither illegal nor subject to judicially inflicted injunctive discontinuance.

The district court is affirmed on the first issue presented and the case is remanded for entry of appropriate declaratory judgment orders in accord with this decision on the second and third issues.

THOMAS, Justice, concurring specially.

I am in total accord with the opinion of the court in this case, and I concur in it. While one of my reactions to the case may border upon the whimsical, I cannot avoid noting an irony I perceive in the contentions of the Union Pacific Resources Company. An earnest argument is made addressing the unseemliness or probable impropriety of expending public funds for reimbursement of the "bounty hunters" on a contingent fee basis. The irony I perceive is that this argument is made on behalf of those who have it within their control to prevent any such payments. All that is required to avoid any contingent fee payments is correct and consistent reporting of oil and gas production by those in the industry. If that goal is achieved, there will be no recoveries out of which to pay such contingent fees.